# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,**

        **Plaintiff,**

    **and**

**RICHMOND INTERNATIONAL FOREST PRODUCTS LLC,** *et al.*,

        **Consolidated-Plaintiffs,**

    **v.**

**UNITED STATES,**

        **Defendant,**

    **and**

**RICHMOND INTERNATIONAL FOREST PRODUCTS LLC,** *et al.*,

        **Defendant-Intervenors.**

</td><td>

**Before: Hon. Jennifer Choe-Groves, Judge**

**Consol. Court No. 20-03930**

**<u>NON-CONFIDENTIAL VERSION</u>**

**Business Proprietary Information Removed from Pages 8, 9, 21, 22, and 24-27**

</td></tr>
</table>

## <u>COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD'S MEMORANDUM IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD</u>

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.
Jeffrey O. Frank, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

Date: June 24, 2021

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................ 1

II.  RULE 56.2 STATEMENT ........................................................................... 1

    A.  Administrative Determination Under Review .......................................1

    B.  Issues Presented ..................................................................................1

III.  STATEMENT OF FACTS ........................................................................... 4

    A.  Background ..........................................................................................4

    B.  Intermediate Input Methodology .........................................................7

    C.  Surrogate Value for Labor ..................................................................11

    D.  Surrogate Financial Ratios .................................................................14

IV.  STANDARD OF REVIEW .......................................................................... 16

V.  ARGUMENT .............................................................................................. 17

    A.  Commerce's Refusal to Use the Intermediate Input Methodology to Calculate the Dumping Margin for Chengen Was Unsupported by Substantial Evidence and Is Not in Accordance with Law .....................17

        1.  Commerce's rejection of the intermediate input methodology was not supported by substantial evidence and otherwise in accordance with law ........................................................................20

        2.  Commerce's reliance on Chengen's log consumption data without taking additional steps to confirm it was arbitrary and capricious ..................................................................................29

    B.  Commerce's Assumption of 24 Working Days Per Month for Calculating the Surrogate Labor Rate Was Unsupported by Substantial Evidence and Is Not in Accordance with Law ....................32

    C.  Commerce's Calculation of the Surrogate Financial Ratio Using Data for Fu Yee and Ta Ann Is Unsupported by Substantial Evidence and Is Not in Accordance with Law .....................................35

        1.  Commerce's use of Ta Ann's financial statement was unsupported and not in accordance with law in light of evidence demonstrating that the company received countervailable subsidies .................................................................36

        2.  Commerce's use of Fu Yee's financial statement was unsupported and not in accordance with law in light of evidence demonstrating that the company should not be considered profitable..................................................................................38

VI.  CONCLUSION............................................................................................ 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alt. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984)..........................................................................16

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962).............................................................................................17, 30

*Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States,*
    37 CIT 1116, 929 F. Supp. 2d 1352 (2013)........................................................34

*Catfish Farmers of Am. v. United States,*
    33 CIT 1258, 641 F. Supp. 2d 1362 (2009).............................................35, 38, 41

*Clearon Corp. v. United States,*
    35 CIT 1685, 800 F. Supp. 2d 1355 (2011).................................................35, 36

*Coal. of Am. Flange Producers v. United States,*
    448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ......................................................32

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938)............................................................................................16

*CS Wind Viet. Co. v. United States,*
    832 F.3d 1367 (Fed. Cir. 2016)..........................................................17, 28, 34, 40

*Diamond Sawblades Mfrs.' Coal. v. United States,*
    No. 17-00167, slip op. 18-146 (Ct. Int'l Trade Oct. 23, 2018).........................34, 35

*Itochu Bldg. Prods., Co. v. United States,*
    163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ......................................................32

*Jacobi Carbons AB v. United States,*
    313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ................................................37, 38

*Jindal Poly Films Ltd. of India v. United States,*
    365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ......................................................33

*Linyi Chengen Imp. & Exp. Co. v. United States,*
    487 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) .................................................8, 19

*Mid Continent Steel & Wire, Inc. v. United States,*
    941 F.3d 530 (Fed. Cir. 2019)............................................................................34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................................17, 32

*NMB Sing. Ltd. v. United States,*
    557 F.3d 1316 (Fed. Cir. 2009) ................................................................17, 32

*Shenzhen Xinboda Indus. Co. v. United States,*
    456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ...........................................36, 37

*SKF USA, Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001)..................................................................28, 34

*SKF USA Inc. v. United States,*
    630 F.3d 1365 (Fed. Cir. 2011)........................................................................17

*Ta Chen Stainless Steel Pipe, Inc. v. United States,*
    298 F.3d 1330 (Fed. Cir. 2002) ......................................................................16

*U.S. Steel Corp. v. United States,*
    37 CIT 1799, 953 F. Supp. 2d 1332 (2013) ...................................................16

*Zhengzhou Harmoni Spice Co. v. United States,*
    33 CIT 453, 617 F. Supp. 2d 1281 (2009) ...............................................18, 20

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................16

19 U.S.C. § 1677b ......................................................................................................35

19 U.S.C. § 1677b(c)(1)........................................................................................20, 35

19 U.S.C. § 1677b(c)(1)(B) ......................................................................................34

**Administrative Materials**

*Antidumping Methodologies in Proceedings Involving Non-Market Economies:*
    *Valuing the Factor of Production: Labor,* 76 Fed. Reg. 36,092 (Dep't
    Commerce June 21, 2011) ..............................................................................34

*Certain Frozen Fish Fillets form the Socialist Republic of Vietnam,*
    74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009) ................................39

*Certain Frozen Warmwater Shrimp from Malaysia,*
    78 Fed. Reg. 50,381 (Dep't Commerce Aug. 19, 2013)................................37

*Certain Hardwood Plywood Products from the People's Republic of China,*
    82 Fed. Reg. 53,460 (Dep't Commerce Nov. 16, 2017)..................................7

*Fresh Garlic from the People's Republic of China*,
    71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) .........................................................18

*Honey from the People's Republic of China*,
    71 Fed. Reg. 34,893 (Dep't Commerce June 16, 2006) .........................................................18

*Xanthan Gum from the People's Republic of China*,
    80 Fed. Reg. 29,615 (Dep't Commerce May 22, 2015) .................................................17, 18

**Other Authorities**

Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576 (1988)
    (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547 .............................................................36

## I.    INTRODUCTION

On behalf of the Coalition for Fair Trade in Hardwood Plywood ("Coalition"), we respectfully submit the following memorandum in support of the Coalition's Rule 56.2 motion for judgement on the agency record in this action.

## II.    RULE 56.2 STATEMENT

### A.    Administrative Determination Under Review

This action challenges the determination by the Department of Commerce ("Commerce") in the administrative review of the antidumping duty order on hardwood plywood products from the People's Republic of China for the period of June 23, 2017 through December 31, 2018. Issues and Decision Memorandum accompanying *Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 77,157 (Dep't Commerce Dec. 1, 2020) (final results of antidumping duty admin. rev.; 2017-2018) ("IDM"), P.R. 210; *Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 77,157 (Dep't Commerce Dec. 1, 2020) (final results of antidumping duty admin. rev.; 2017-2018) ("Notice of Final Results"), P.R. 218.[1]

### B.    Issues Presented

#### 1.    Whether Commerce's calculation of the dumping margin for Chengen without using the intermediate input methodology was supported by substantial evidence and otherwise in accordance with law.

No. Commerce is directed to rely on the best available information to calculate normal value in a non-market economy ("NME") proceeding. As detailed at length in the Coalition's

---

[1]    Documents on the agency record are referred to within this brief by the number provided in Commerce's administrative record index, filed with the Court on February 1, 2021, ECF No. 23. Confidential documents are referred to with the rubric "C.R." followed by the relevant number; public documents and public versions of confidential documents are referred to by the rubric "P.R." followed by the relevant number.

submissions before the agency, there are numerous issues with Linyi Chengen Import and Export

Co., Ltd.'s ("Chengen") reported log consumption that render the data inherently less accurate

than veneer consumption. In particular, the manner in which Chengen maintains its records and

calculated its log consumption data introduce inaccuracies and distortions into the reported log

consumption. In contrast, these issues do not exist with respect to the veneer consumption data. In

rejecting the use of the intermediate input methodology, Commerce failed to fully grapple with

the inherent issues present with respect to Chengen's log consumption data or to explain why these

data constitute the best available information in light of the increased accuracy of the veneer data.

Moreover, Commerce's reliance on the log data was unreasonable and unjustified given that it

recognized the need for verification but failed to take any steps to further verify Chengen's data or

explain why such actions were no longer necessary. As such, the agency's determination is not

supported by substantial evidence or otherwise in accordance with law.

> **2.      Whether Commerce's calculation of the surrogate labor rate using an assumption of 24 working days a month was supported by substantial evidence or in accordance with law.**

No. In its final determination, Commerce modified its method for calculating an hourly

surrogate labor rate to be based on an assumption of 24 working days per month as opposed to 21

working days per month, as it had done in the preliminary determination. Commerce's justification

for doing so was limited to a statement that its preliminary methodology was an inadvertent error

and it was conforming its calculation with its normal practice. However, this determination failed

to address in any manner the Coalition's arguments and analysis demonstrating that an assumption

of 21 working days per month results in a more accurate surrogate labor rate. As Commerce did

not address this argument or explain why its determination was appropriate in light of the

detracting information presented by the Coalition, the agency's labor surrogate value ("SV") calculation was not supported by substantial evidence or otherwise in accordance with law.

> **3.    Whether Commerce's use of Fu Yee's and Ta Ann's financial statements to calculate the surrogate financial ratios was supported by substantial evidence or in accordance with law.**

No. When selecting information for the calculation of normal value in an NME proceeding, Commerce is directed to use the best available information. This extends to the data relied on to calculate the surrogate financial ratios and is implemented through Commerce's practice of generally declining to rely on financial statements that, among other things, show that the company received countervailable subsidies or was not profitable. Here, however, Commerce failed to adequately address information showing that Ta Ann Plywood Sdn. Bhd.'s ("Ta Ann") and Fu Yee Corporation Sdn. Bhd.'s ("Fu Yee") financial statements suffered from these very shortcomings. In particular, Ta Ann's financial statement contained information indicating that the company benefited from a subsidy program that Commerce has previously found to be countervailable, yet Commerce failed to explain why this information was not a sufficient basis for rejecting this financial statement. Likewise, a consideration of Fu Yee's full financial statement demonstrated that the company should not be considered profitable notwithstanding the marginal profit it showed, but Commerce refused to consider this information. As Commerce did not explain why it was appropriate to rely on these financial statements notwithstanding the information highlighted by the Coalition, its reliance on these documents was unsupported by substantial evidence and not otherwise in accordance with law.

### III.   STATEMENT OF FACTS

#### A.   Background

On April 1, 2019, Commerce published its notice of initiation of the first administrative review of the antidumping duty order on hardwood plywood from China. *See* Preliminary Determination Memorandum accompanying *Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 7,270 (Dep't Commerce Feb. 7, 2020) (prelim. results of antidumping duty admin. rev.; 2017-2018) at 2 ("Prelim. Memo"), P.R. 163. Commerce subsequently selected two companies—Chengen and Lianyungang Yuantai International Trade Co., Ltd. ("Yuantai")—as mandatory respondents. *Id.* at 3. Yuantai notified Commerce that it did not intend to participate in the proceeding, and the review as to it was subsequently rescinded. *Id.* at 3-4. However, Chengen responded to questionnaires issued by the agency between July 2019 and January 2020. *Id.* Commerce issued its preliminary determination on January 31, 2020, in which it calculated a dumping margin of 0.93% for Chengen, which was also applied to the companies that were eligible for a separate rate. *Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 7,270, 7,271 (Dep't Commerce Feb. 7, 2020) (prelim. results of antidumping duty admin. rev.; 2017-2018), P.R. 171.

Noting the dispute between the parties both in the underlying investigation and the administrative review regarding whether the intermediate input methodology should be used to calculate the dumping margin for Chengen, Commerce stated in its preliminary determination that it intended "to conduct a verification of the accuracy of Chengen's log volume calculation, its reported consumption rates, and its sales and accounting documentation . . . ." Prelim. Memo at 19-21. Approximately two months after the issuance of the preliminary determination, and prior to the issuance of a verification schedule or briefing schedule, the Coalition submitted a letter to

Commerce regarding its intended verification of Chengen. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Petitioner's Request for Supplemental Questionnaire in Lieu of Verification* (Mar. 26, 2020) at 21-26 ("Coalition's Req. for SQR in Lieu of Verification"), C.R. 138-139, P.R. 178-179. Specifically, as it had become evident that an in-country verification was not likely to occur due to the COVID-19 pandemic, the Coalition requested that Commerce issue a supplemental questionnaire to Chengen to collect additional information to substantiate its reporting methodology. *Id.* Commerce did not respond to the Coalition's letter, and shortly thereafter issued a briefing schedule with respect to issues unrelated to Chengen's verification; however, in response to a request from the Coalition, Commerce subsequently temporarily suspended the deadline for all briefing until after verification was either cancelled or completed. Memorandum from Kabir Archulettta, Senior Int'l Trade Analyst, Enf't and Compliance, Off. V, to Interested Parties, re: *Administrative Review of the Antidumping Duty Order on Certain Hardwood Plywood Products from the People's Republic of China: Suspension of Briefing Schedule* (Apr. 23, 2020), P.R. 182. The following day, Commerce issued a notice stating that it was uniformly tolling deadlines for all antidumping and countervailing duty reviews by 50 days in light of "operational adjustments due to COVID-19." Memorandum from Jeffrey I. Kessler, Assistant Sec'y for Enf't and Compliance, to The Record, re: *Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID-19* (Apr. 24, 2020), P.R. 183.

Approximately one and a half months later, Commerce formally cancelled verification, pointing to a travel advisory that was issued by the U.S. Department of State, advising U.S. citizens to avoid international travel; this advisory was issued March 31, 2020, less than one week after the Coalition had initially requested that Commerce obtain additional information from Chengen in

light of the likely cancellation of verification. Memorandum from Shawn Thomson, Director, Off. V, AD/CVD Operations, to Interested Parties, re: *Administrative Review of the Antidumping Duty Order of Certain Hardwood Plywood Products from the People's Republic of China: Cancellation of Verification and Establishment of Briefing Schedule* (June 15, 2020), P.R. 186. In doing so, Commerce also established a briefing schedule. *Id.* Shortly thereafter, the Coalition again requested that Commerce solicit additional information from Chengen in lieu of verification. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Petitioner's Renewed Request to Issue Supplemental Questionnaire in Lieu of Verification* (June 17, 2020), P.R. 187. Commerce did not respond to this request, and soon thereafter, parties submitted case and rebuttal briefs. *See* IDM at 2.

After the completion of briefing, Commerce postponed the issuance of the final results pursuant to its regulations. *See id.* Soon thereafter, Commerce again tolled the statutory deadlines for administrative reviews due to COVID-19, this time by 60 days. Memorandum from Jeffrey I. Kessler, Assistant Sec'y for Enf't and Compliance, to The Record, re: *Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews* (July 21, 2020), P.R. 200. On November 23, 2020, 290 days after the publication of the preliminary determination, Commerce issued its final determination. *See* IDM at 1-2. Based on certain modifications made to its calculations in response to the arguments raised in the case and rebuttal briefs, Commerce calculated a dumping margin of 14.95% for Chengen, and this revised margin was also applied to the separate rate companies. Notice of Final Results, 85 Fed. Reg. at 77,158. Following the issuance of the final determination, the Coalition filed a summons and complaint with this Court, challenging certain aspects of Commerce's determination. The facts specific to the issues challenged by the Coalition are outlined below.

### B.    Intermediate Input Methodology

As this Court is aware, the appropriate method for calculating Chengen's normal value has been the subject of substantial discussion since the underlying investigation. By way of background, in the final determination of the of underlying investigation, Commerce calculated Chengen's dumping margin using the intermediate input methodology, relying on veneer factors of production ("FOPs") instead of log FOPs to calculate normal value. Issues and Decision Memorandum accompanying *Certain Hardwood Plywood Products from the People's Republic of China*, 82 Fed. Reg. 53,460 (Dep't Commerce Nov. 16, 2017) (final deter. of sales at less than fair value, and final affirm. deter. of critical circumstances, in part) at 23-28. Commerce's determination, which was a change from its preliminary determination, was based on its experience at verification, during which it made observations that called into question the accuracy of Chengen's log purchase and consumption records and its ability to substantiate such records. *Id.* at 24. In particular, Commerce highlighted questions raised regarding the conversion formula used by Chengen to derive log volumes and Chengen's inability to provide supplier invoices for poplar log purchases. *Id.* at 24-26. As a result, Commerce found that Chengen was "unable to accurately report and substantiate its consumption of logs used to produce veneers." *Id.* In contrast, Commerce noted measurements maintained regarding the intermediate input, veneers, were "inherently more accurate than the imprecise and approximate measurements of varying and irregularly shaped logs" as the veneers were "rectangular and uniformly shaped products of standard dimensions from machines designed to produce consistent results . . . ." *Id.* at 28. Accordingly, Commerce determined that it was appropriate to apply the intermediate input methodology. *Id.* at 25. Following a challenge to this determination and two remands issued by this Court, Commerce reversed its determination from the original investigation, under respectful

protest, and declined to apply the intermediate input methodology to calculate Chengen's dumping margin. *See Linyi Chengen Imp. & Exp. Co. v. United States*, 487 F. Supp. 3d 1349, 1353-56 (Ct. Int'l Trade 2020); IDM at 13-14. The Court sustained this determination. *See Linyi Chengen Imp. & Exp.*, 487 F. Supp. 3d at 1353-56.

The administrative review at issue here was ongoing concurrently with the litigation concerning the underlying investigation and, as with the investigation, Commerce's method for calculating Chengen's normal value was at issue. Specifically, in its initial Section D questionnaire response Chengen reported that it calculated its FOPs "according to its production records." Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Sections C and D Questionnaire Response* (July 23, 2019) at D-3 – D-4, D-12 ("Chengen Sec. DQR"), C.R. 38-49, P.R. 90. Chengen's calculation worksheets showed that, with respect to the reported log FOPs, the company first calculated [

]. *Id.* at Exhibit D-2.1. Chengen next [

]. *Id.* at Exhibit D-2.3. Finally, Chengen

[

]. *Id.* at Exhibit D-2.4.

Following Chengen's submission of its initial Section D questionnaire response, the Coalition submitted lengthy comments, requesting that Commerce collect Chengen's veneer consumption FOPs and identifying numerous reasons why the intermediate input methodology should be used. *See generally* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Petitioner's Deficiency Comments on Chengen's Questionnaire Responses* (Nov. 1, 2019), C.R. 89, P.R. 136. In particular, the Coalition

highlighted inaccuracies inherent in Chengen's log consumption reporting stemming from the types of records Chengen maintains (and does not maintain) and the manner in which the yield loss ratio is calculated. *Id.*

In response to these questions, in a supplemental questionnaire, Commerce requested that Chengen submit an FOP database that contained veneer consumption rates. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Supplemental Section D Questionnaire Response* (Dec. 2, 2019) at 4 ("Chengen Supp. D QR"), C.R. 99-125, P.R. 148. This questionnaire also requested additional information regarding Chengen's log consumption records and reporting. *Id.* at 4-18. In responding, Chengen explained that its "standard consumptions of [                    ] are calculated according to Dongfangjuxin's bill of materials (BOMs) for each product type that the company workers have relied on or made reference to for the production arrangement in the daily operations." *Id.* at 25. Chengen also clarified that the [                         ] used in the normal course business and for its reported [                    ] FOPs were "based on production standards, and bill of materials (BOM) as maintained in the normal course of business." *Id.* at 26. Additionally, Chengen explained that, [

]. *Id.* at Exhibit SQ3-17. Notwithstanding the information provided in Chengen's supplemental questionnaire response, Chengen's log FOPs continued to suffer from multiple shortcomings that rendered them less accurate than the reported veneer FOPs. *See*

*generally* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Petitioner's Pre-Preliminary Comments on Chengen's Questionnaire Responses* (Jan. 13, 2020) at 1-23, C.R. 127, P.R. 158.

Nonetheless, in its preliminary determination, Commerce stated that it was calculating Chengen's normal value based on its reported log consumption data. Prelim. Memo at 19-21. In doing so, Commerce did not address the arguments raised by the Coalition, and instead focused on the issues that led it to apply the intermediate input methodology in the underlying investigation. *Id.* However, Commerce concluded by stating:

> Commerce intends to continue to evaluate its preliminary decision not to apply the intermediate input methodology, given the significance of this issue. Based on the foregoing, and provided that the conditions in China allow, Commerce intends to conduct a verification of the accuracy of Chengen's log volume calculation, its reported consumption rates, and its sales and accounting documentation, in accordance with section 782(i)(3)(B) of the Act because we find that the disagreement between interested parties with respect to such a fundamental component of our calculation, i.e., whether to value the respondent's actual FOPs or intermediate input, constitutes good cause for verification.

*Id.* at 21. As detailed above, notwithstanding this statement and repeated requests from the Coalition that the agency take additional steps to verify Chengen's data, Commerce ultimately cancelled verification and took no further action with regard to verifying or obtaining additional information from Chengen.

As a result, in its case brief, the Coalition outlined the numerous bases demonstrating that the intermediate input methodology should be used given the distortions present in Chengen's log reporting and the relatively greater accuracy of the veneer consumption data. In particular, the Coalition explained that Chengen's veneer FOPs were more accurate than log FOPs, that Chengen's records do not allow for accurate log FOPs, that Chengen's log consumption yield ratio is distorted, and that important cost elements are not captured using log FOPs. Letter from Wiley

Rein LLP to Sec'y Commerce, re: *Hardwood Plywood from the People's Republic of China: Petitioner's Resubmission of Case Brief* (Nov. 13, 2020) at 9-33 ("Coalition Case Br."), C.R. 142, P.R. 208. The Coalition also highlighted the issues stemming from Commerce's failure to take any actions to further verify Chengen's reporting in light of its statements in the preliminary determination. *Id.* at 5-9. Nonetheless, in its final determination, Commerce continued to reject the use of the intermediate input methodology. IDM at 6-19. Commerce first rejected the Coalition's request that it take additional steps to verify Chengen's data "because verification is not possible under the current conditions, and statutory deadlines prevent us from issuing a supplemental questionnaire or postponing the final results any further . . . ." *Id.* at 7. Commerce then found that the record did not support departure from its normal practice in favor of using the intermediate input methodology, consistent with its determination in the underlying investigation made on remand and under protest. *Id.* at 13-14. Commerce explained that it obtained additional information regarding the formula Chengen used to calculate log volumes and documentation received from log suppliers, issues underlying its reliance on the intermediate input methodology in the original investigation. *Id.* Commerce next addressed the issues raised by the Coalition, stating that it disagreed that the veneer FOPs were more accurate and that Chengen's log consumption data were inaccurate and unreliable. *Id.* at 15-19. Consequently, Commerce concluded that "a departure from our preferred methodology of valuing the actual inputs consumed by the respondent to produce subject merchandise is not warranted by the record of this review." *Id.* at 19.

## C.   <u>Surrogate Value for Labor</u>

Consistent with its normal practice in proceedings involving NME countries, Commerce solicited information from the parties regarding the information to be used to value Chengen's

FOPs for the purpose of calculating normal value. *See* Prelim. Memo at 13-19. Based on the information submitted by the parties, Commerce selected Malaysia as the primary surrogate country. *See* Memorandum from Kabir Archuletta, Senior Int'l Trade Analyst, Off. V, Enf't and Compliance, through Emily Halle, Acting Program Manager, Off. V, Enf't and Compliance, to The File, re: *Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Surrogate Value Memorandum* (Jan. 31, 2020) at 2 ("Prelim. SV Memo"), P.R. 167-168. For the purpose of valuing labor, both the Coalition and Chengen submitted Malaysian wage rate data. Letter from Wiley Rein to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Submission of Surrogate Values* (Sept. 13, 2019) at Exhibit M-3, P.R. 109-115; Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Rebuttal Surrogate Value Submission* (Sept. 23, 2020) at Exhibit SVR-4, P.R. 120.

In its preliminary determination, Commerce calculated the surrogate labor rate based on industry-specific wage data from the Malaysian Department of Statistics submitted by Chengen. Prelim. SV Memo at 3. In doing so, it converted the reported monthly wage data to an hourly wage rate based on the assumption that there are 21 working days in a month and eight working hours in a day. *Id.* at Attachment 9. In its case brief, the Coalition argued that the "Trading Economics – Malaysia" data it had submitted constituted the best available information for valuing Chengen's labor FOPs and should be used for the final determination. Coalition Case Br. at 37-38. Additionally, in its case brief Chengen argued that Commerce should modify the calculation of the hourly labor rate by using an assumption of 24 working days per month because that is the assumption that the agency "normally relies upon . . . ." Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Case*

*Brief* (June 29, 2020) at 5, P.R. 190. Other than noting that this is the approach usually used by Commerce, Chengen did not point to anything demonstrating that this assumption was accurate or appropriate. *Id.* In its rebuttal brief, the Coalition urged Commerce to continue to use an assumption of 21 working days per month, as it resulted in a more equitable and reasonable labor SV. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Petitioner's Rebuttal Case Brief* (July 10, 2020) at 6-7 ("Coalition Rebuttal Br."), P.R. 198. In particular, the Coalition demonstrated that 24 working days per month is more than the number of Monday through Friday working days in any given month. *Id.* at 6. Instead, a more accurate calculation demonstrates that there are approximately 21 working days per month. *Id.* Moreover, the Coalition highlighted that this is still a conservative estimate, as it does not account for other non-working days such as holidays, vacation, and sick days. *Id.* at 6-7. As such, the Coalition argued that Commerce should continue to calculate an hourly labor rate based on the assumption of 21 working days per month, as this would results in the more accurate labor rate. *Id.*

In its final determination, Commerce agreed with the Coalition that the wage data from "Trading Economics – Malaysia" constituted the best available information for valuing Chengen's labor FOP. IDM at 31. However, to calculate an hourly wage rate, Commerce modified its preliminary approach of using an assumption of 21 working days per month and instead relied on an assumption of 24 working days per month. *Id.* Commerce stated that it was doing so because it had "inadvertently" relied on an assumption of 21 working days per month in its preliminary determination and its "stated practice" was to use 24 working days per month. *Id.*

### D.     Surrogate Financial Ratios

As noted above, consistent with its calculation methodology for proceedings involving NMEs, Commerce collected data regarding the valuation of the FOPs and selected Malaysia as the primary surrogate country. With respect to information for the valuation of the surrogate financial ratios, the parties submitted financial statements for seven Malaysian plywood producers: Focus Lumber Berhad ("Focus"), Fu Yee, Jid Fu Plywood Sdn. Bhd. ("Jid Fu"), Megamas Plywood Sdn. Bhd. ("Megamas"), Sabajuta Industries Sdn. Bhd. ("Sabajuta"), Samawang Sawmill Sdn. Bhd. ("Samawang"), and Ta Ann. *See* Prelim. Memo at 17. In examining which financial statements to rely on for the preliminary results, Commerce stated that "{e}ach of these statements is contemporaneous and shows no evident signs of countervailable subsidies, and certain of these statements indicate that the companies primarily sold plywood." *Id.* at 17-18. Specifically, Commerce noted that the financial statements for Focus, Fu Yee, Megamas, and Ta Ann demonstrated that the companies were primarily engaged in the production of plywood. *Id.* at 18. In contrast, the financial statements for Sabajuta and Samawang did not "identify the relative product mix of the Malaysian producers' sales" and thus were less preferable compared to other information on the record. *Id.* In addition, Commerce noted that Jid Fu's financial statement was not reliable because it contained a qualified auditor's opinion. *Id.* Accordingly, for the preliminary results, Commerce relied on the financial statements of Focus, Fu Yee, Megamas, and Ta Ann to calculate the surrogate financial ratios. *Id.*; Prelim. SV Memo at 4 and Attachment 10.

In its case brief, the Coalition raised arguments regarding the calculation of the surrogate financial ratios, explaining that Commerce should not rely on the financial statements of Fu Yee, Megamas, or Ta Ann because they contained various inaccuracies and deficiencies. Coalition Case Br. at 33-35. In particular, the Coalition explained that Ta Ann's financial statement demonstrated

that the company had received countervailable subsidies as evidenced by the discussion and inclusion of a "reinvestment allowance" in its data; the Coalition also noted issues with the reported depreciation and resulting low fixed overhead ratio. *Id.* at 33-34. With respect to Fu Yee, the Coalition explained that an examination of the whole financial statement demonstrated that the company was able to show a minimal profit only because it delayed paying certain business expenses. *Id.* at 34. Specifically, Fu Yee's financial statement showed a substantial increase in trade and other payables compared to the prior year, notwithstanding almost identical revenues and costs, resulting in payables that were 25 times greater than the reported profit. *Id.* at 34-35. Additionally, Fu Yee' s financial statement showed outstanding "Hire purchase payables" on which Fu Yee was accumulating interest. *Id.* Finally, the Coalition explained that Megamas's financial statement should not be used because the auditor's note included a "Material Uncertainty Related to Going Concern" because it had negative operating cash flows and its current liabilities exceeded its current assets. *Id.* at 35.

        In the final determination, Commerce agreed in part with the Coalition's arguments. In particular, Commerce agreed that it was not appropriate to use Megamas's financial statement in light of the statement of material uncertainty included in the auditor's note. IDM at 21-22. Additionally, with respect to Ta Ann's financial statement, Commerce adjusted the allocation of certain depreciation expenses. *Id.* at 22. However, Commerce disagreed that Ta Ann's financial statement should be excluded due to the receipt of countervailable subsidies, stating that it "find{s} no information that indicates that Ta Ann was receiving any countervailable subsidies" and that there was "no information as to how th{e} reinvestment allowance constitutes a subsidy from a program that Commerce previously found to be countervailable . . . ." *Id.* Commerce likewise rejected the argument that Fu Yee's financial statement should not be used, stating that it "does

not look beyond the plain language in financial statements to speculate as to what each item

includes or how each item should be treated{,}'" as it cannot compel Fu Yee to provide additional

information and the auditor's report contained an unqualified opinion. *Id.* at 21. Thus, Commerce

stated that there was no basis "to find the stated profit figure unreliable." *Id.* Commerce also stated

that "there is nothing in the financial statements to support the claim that Fu Yee incurred late fees

related to overdue payment" with respect to the "hire purchase payables" and that it disagreed "that

it would be appropriate to treat the outstanding payables amount essentially as a write-off . . . ."

*Id.* Consequently, Commerce continued to rely on Ta Ann's and Fu Yee's financial statements in

its final determination.

## IV.      **STANDARD OF REVIEW**

The U.S. Court of International Trade reviews decisions by Commerce in antidumping duty

proceedings to determine whether those decisions are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir.

2002) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). A determination as to

whether substantial evidence exists must be based on the record as a whole, taking into

consideration both supportive evidence "as well as evidence that 'fairly detracts from the

substantiality of the evidence.'" *Id.* (quoting *Alt. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562

(Fed. Cir. 1984)).

Moreover, "{t}o be in accordance with law, a decision must not be arbitrary and

capricious . . . and must be supported by substantial evidence and reasoned explanations." *U.S.*

*Steel Corp. v. United States*, 37 CIT 1799, 1801-02, 953 F. Supp. 2d 1332, 1336 (2013) (citing

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-43 (1983); *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373-74 (Fed. Cir. 2011)). To meet the "arbitrary and capricious" standard, Commerce must have "examine{d} the relevant data and articulate{d} a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). While Commerce's explanations do not need to be perfect, "the path of Commerce's decision must be reasonably discernable to a reviewing court." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing *State Farm*, 463 U.S. at 43); *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (remanding to Commerce because the agency did not provide "the needed explanation setting forth the interpretations and evidence-based factual findings that establish the required connection from statute to determination").

## V.    **ARGUMENT**

### A.    **Commerce's Refusal to Use the Intermediate Input Methodology to Calculate the Dumping Margin for Chengen Was Unsupported by Substantial Evidence and Is Not in Accordance with Law**

While Commerce typically calculates normal value in NME proceedings based on valuing the FOPs for the individual inputs used in production, the agency will rely on a respondent's intermediate input under certain circumstances. *See, e.g.*, Issues and Decision Memorandum accompanying *Xanthan Gum from the People's Republic of China*, 80 Fed. Reg. 29,615 (Dep't Commerce May 22, 2015) (final results of 2013 antidumping duty new shipper rev.) at cmt. 1. In particular, Commerce has stated that reliance on the intermediate input methodology is appropriate where "attempting to value the FOPs used in a production process yielding an intermediate product would lead to an inaccurate result because a significant element of cost would not be adequately

accounted for in the overall {normal value} buildup when surrogate values ('SVs') are applied to the FOPs." *Id.* The agency has further explained that it must determine "if valuing the intermediate input for the production of subject merchandise will lead to a more accurate result than valuing the individual FOPs . . . ." Issues and Decision Memorandum accompanying *Fresh Garlic from the People's Republic of China*, 71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) (final results and partial rescission of antidumping duty admin. rev. and final results of new shipper revs.) at cmt. 1 ("*Garlic from China* IDM"). As this Court has recognized, Commerce relies on the intermediate input methodology in pursuit of its statutory directive to value FOPs based on the best available information. *See Zhengzhou Harmoni Spice Co. v. United States*, 33 CIT 453, 460, 617 F. Supp. 2d 1281, 1291 (2009).

Based on this approach, Commerce has found that valuing the intermediate input yields more accurate results than valuing the individual inputs when it determines that a respondent is unable to accurately record and substantiate the complete factor information associated with producing the subject merchandise. *See Garlic from China* IDM at cmt. 1; *see also* Issues and Decision Memorandum accompanying *Honey from the People's Republic of China*, 71 Fed. Reg. 34,893 (Dep't Commerce June 16, 2006) (final results and final rescission, in part, of antidumping duty admin. rev.) at cmt. 9 ("*Honey from China* IDM"). Although the determination of whether a respondent is able to accurately record and substantiate its FOPs is a fact-specific inquiry, deficiencies that Commerce has considered to conclude that a respondent is unable to accurately record and substantiate its factors include: (1) not maintaining appropriate records which would allow the respondent to quantify, report, and substantiate FOPs; (2) not accounting for many unknown variables in its books and records that may affect or influence reported FOPs; (3) not reporting or accounting for all of the relevant information to identify all of the necessary FOPs in

its books and records, which significantly inhibits Commerce's ability to conduct a meaningful verification of reported information; and (4) errors in the FOP data. *See, e.g., Garlic from China* IDM at cmt. 1; *Honey from China* IDM at cmt. 9.

Based on this framework, the Coalition demonstrated that the intermediate input methodology should be used to calculate Chengen's dumping margin given that the company did not maintain records that allow it to accurately quantify and report the amount of logs consumed and the information available with respect to veneer consumption resulted in a more accurate calculation. *See* Coalition Case Br. at 9-33. In doing so, the Coalition outlined numerous shortcomings in Chengen's reported log consumption data, rendering reliance on such data less accurate than utilizing the intermediate input methodology and calculating Chengen's normal value based on veneer consumption. *Id.* In other words, the Coalition demonstrated that the best available information on the record was the data related to veneer consumption, as opposed to log consumption. *Id.* As discussed in detail below, Commerce's bases for rejecting this argument are inconsistent with the record and fail to adequately explain the agency's reasoning in light of the record as a whole. As such, the Coalition respectfully requests that the Court find Commerce's calculation of Chengen's normal value based on its reported log consumption not supported by substantial evidence or otherwise in accordance with law.[2]

---

[2]     The Coalition recognizes the determination in *Linyi Chengen Import & Export Co. v. United States*, in which this Court sustained Commerce's determination upon remand to reject the use of the intermediate input methodology to calculate the dumping margin for Chengen in the antidumping duty investigation underlying the administrative review at issue here. *Linyi Chengen Imp. & Exp.*, 487 F. Supp. 3d at 1353-56. As each antidumping duty proceeding is an independent proceeding with a separate record, the Coalition respectfully submits that, notwithstanding the Court's determination with respect to the investigation, the record underlying this proceeding and the arguments raised herein demonstrate that Commerce's determination was unsupported by substantial evidence and not in accordance with law.

### 1. Commerce's rejection of the intermediate input methodology was not supported by substantial evidence and otherwise in accordance with law

In explaining why using the intermediate input methodology was appropriate in this administrative review and would result in Commerce relying on the best available information, the Coalition highlighted a number of specific issues with Chengen's log consumption data demonstrating its inherent inaccuracy and unreliability and emphasizing that these same concerns did not exist with respect to veneer consumption data. *See* Coalition Case Br. at 13-33. As discussed in detail below, in rejecting these arguments, Commerce failed to grapple with the underlying issue, did not adequately explain its reasoning, and/or did not account for information detracting from its conclusions. As such, Commerce's determination to reject the intermediate input methodology and rely on Chengen's reported log FOPs to calculate normal value was not supported by substantial evidence or otherwise in accordance with law.

### a. Commerce failed to adequately explain why veneer consumption data did not constitute the best available information

As noted above, underlying Commerce's use of the intermediate input methodology is the statutory directive that the agency rely on the best available information in valuing FOPs in an NME proceeding. *See Zhengzhou Harmoni Spice*, 33 CIT at 463, 617 F. Supp. 2d at 1293 ("Commerce's intermediate input valuation methodology was developed pursuant to the agency's broad statutory authority, and in accordance with its statutory mandate to base its determinations 'on the best available information' concerning the values of the factors of production at issue." (citing 19 U.S.C. § 1677b(c)(1))). Thus, here, Commerce was faced with the question of not simply whether it considered Chengen's log consumption data usable, but also whether these data constituted the best available information. In that regard, in arguing in favor of the intermediate input methodology, the Coalition highlighted as an initial matter the relatively greater accuracy of

the consumption data on the record with respect to veneers. *See* Coalition Case Br. at 13-14. Specifically, as the Coalition explained, the "veneer FOPs were derived from BOMs and used the actual veneer consumption amounts as reflected on inventory slips for veneers that were pulled directly from inventory and then immediately used in production." *Id.* at 13; *see* [



]. In contrast, Chengen maintains limited production records associated with its production of veneer from logs. *See* Coalition Case Br. at 14-16. As a result, Chengen's log FOPs were derived by applying a calculated yield loss ratio to the veneer FOPs, with the yield loss ratio in turn being derived from other data sources. *Id.* As the Coalition explained, because the veneer FOPs were based directly on BOMs and the veneer consumption identified in inventory slips, the uncertainties that develop from attempting to back into consumption data, as was done for log consumption, do not exist for the veneer FOPs. *Id.* at 13-14. Thus, the veneer FOPs are inherently more reliable than the log veneer FOPs and constitute the best available information. *Id.*

In its final determination, Commerce failed to address this issue. While the agency did note that the Coalition highlighted the lack of BOMs identifying log consumption, it did not grapple with the inherent increase in accuracy with respect to veneer FOPs that stems from the reporting of veneer consumption data in such documents. IDM at 15. Instead, Commerce discussed this only in the context of "agree{ing} with Chengen that it makes no sense to maintain BOMs for veneer production because BOMs serve as a recipe for production, and it would serve no purpose to rely on a recipe that had a single ingredient (logs) that was placed through a single process (rotary peeling)." *Id.* This argument misses the point. Regardless of whether it "makes sense" to maintain

BOMs that identify log consumption, the relevant fact is that Chengen has BOMs detailing veneer consumption but does not have BOMs (or other similar documentation) detailing log consumption.

For this same reason, Commerce's highlighting of the documents that are maintained regarding Chengen's log consumption and veneer production falls short. *See id.* While Chengen may maintain various documents regarding its log purchases and consumption, it does not maintain documents in the normal course of business reporting the quantity of logs needed to produce a particular product; in contrast, Chengen does maintain in the normal course of business documents that outline the amount of veneers needed to produce a particular product. *See* Coalition Case Br. at 14-16. Regardless of whether Chengen's log documents are typical or otherwise considered reliable, they do not contain the same level of specificity or accuracy as the veneer documentation with respect to production and consumption. *Id.* Indeed, the fact that the log FOPs were backed into by [

], underscores this very point. *See* Chengen Sec. DQR at Exhibits D-2.1–D-2.4; Chengen Supp. D QR at Exhibit SQ3-17. Consequently, veneer FOPs can be reported with a level of accuracy that cannot be replicated for logs because Chengen does not maintain the same type of records and, therefore, veneer FOPs constitute the best available information. Commerce's failure to address this issue in any meaningful manner detracts from the agency's conclusion and renders it unsupported and insufficiently explained.

Similarly, Commerce faulted the Coalition for "neglect{ing} to explain how the veneer SVs, when applied to the veneer FOPs, results in a more accurate margin" given that the veneer SV data were for "Face Veneer Sheets" and more core veneers than face veneers are used in Chengen's production. IDM at 15. However, this too fails to address the underlying issue presented

by the Coalition, as it fails to address at all the key issue of valuation between logs and veneers. Commerce's distinction between face veneers and core veneers cannot possibly justify why it considered the log consumption data the best available information. While Commerce expressed a concern that the SV data on the record for veneers detracts from the accuracy of using veneer FOPs, the agency did not explain why this necessarily rendered the veneer data less accurate than the log consumption data or demonstrated that the latter were the best available information. In other words, Commerce did not analyze or explain why any inaccuracy stemming from the SV data necessarily outweighed the accuracy of the FOP data. In short, Commerce failed to address the Coalition's most important argument—that the veneer FOP data were more reliable than the log FOP data—and thus failed to address an important aspect of the question before it. As such, Commerce's conclusory rejection of the veneer FOP data being more accurate is not supported by substantial evidence and otherwise not in accordance with law.

> **b.** **Commerce failed to adequately explain why log consumption data constituted the best available information given the inherent flaws in the data**

Commerce also failed to adequately explain why the log consumption data constituted the best available information in light of the multiple shortcomings in Chengen's records that undermine and raise serious questions regarding the data's alleged accuracy. First, the Coalition explained that Chengen's yield loss ratio is inherently inaccurate because it fails to take into account the grade of veneers that are produced. *See* Coalition Case Br. at 20-23. Specifically, Chengen's yield loss ratio is calculated by dividing total logs consumed during the POR by total veneers produced during the POR. *See id.* at 13. Commerce dismissed this argument by stating the veneer SVs do not account for grade and thus, even if Chengen was only using high quality veneers and stockpiling inferior veneers "there would be no practical effect . . . ." IDM at 16. This

misunderstands the Coalition's argument. The issue identified by the Coalition with respect to Chengen's lack of records regarding veneer quality relates not to how these inputs are ultimately valued via SVs, but how this affects the reported log consumption amount.

Specifically, Chengen's yield loss ratio calculation presumes that every veneer produced is usable for plywood production. However, this is demonstrably incorrect. As Chengen has explained, it only uses certain grades in the production of plywood. *See* Coalition Case Br. at 21. Thus, only certain grades are suitable for use and, given that Chengen does not maintain records for veneer quality, it cannot document the type and amount of veneers that move through its inventory or that remain in inventory as unsuitable for plywood production. *See id.* In other words, if Chengen peeled 100 veneers from one log and put them into inventory, but only 70 of those veneers were able to be pulled out of inventory as suitable for use in the production of plywood, it would be distortive to use the quantity of all 100 veneers in denominator of the yield loss ratio. Notably, Chengen [

]. Moreover, in its [

]. In other words, the record indicates that the very problem highlighted by the Coalition does in fact exist. As Commerce failed to address this argument, it failed to consider an issue material to its determination or explain how such information does not undermine its conclusion.

Second, record evidence calls into question the accuracy of Chengen's reported yield ratio, and Commerce failed to adequately explain how its determination is supported in light of this

information. As the Coalition explained, the production of veneers generates a substantial amount

of scrap. *See* Coalition Case Br. at 23-24. For example, scrap is generated from debarking logs,

peeling irregularly shaped logs to make them round, during the peeling stage, and when veneers

are cut before drying. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Hardwood Plywood*

*Products from the People's Republic of China: Placing Information from the Investigation on the*

*Record of this Administrative Review* (Sept. 24, 2019) at Exhibit 3.2, p. 13 ("Coalition Letter

Containing Info from Investigation"), C.R. 57-87, P.R. 122-132. Based on all the ways in which

scrap is generated during the veneer production process, Chengen's reported yield rate of [

           ] is inherently unreasonable. *See* Coalition Case Br. at 23-24. The

unreasonableness of this yield rate is confirmed by information placed on the record by the

Coalition. In particular, the Coalition provided information from [

           ]. *See id.* The Coalition also submitted

information that the U.S. industry obtained from [

           ]. *Id.* at 24-25. The

[                                                                        ] supports the

Coalition's arguments regarding the unreliability of and inaccuracy in Chengen's reported yield

ratio. Commerce summarily dismissed this information, stating that it had previously considered

and rejected this argument in the context of the litigation regarding the underlying investigation.

IDM at 16-17. As an initial matter, Commerce's reliance on a separate determination fails to

provide a reasonably discernable path of the agency's determination here and fails to address how

it is reasonable for Chengen to report a yield ratio that [

           ].

Further, Commerce's analysis does not appear to consider the full record. Specifically, Commerce stated that it relied on a comparison of log volumes calculated using the Chinese National Standard versus the volume of a simple uniform cylinder and concluded that the difference between the two volumes could be attributable to "the amount of wood that would need to be removed from a log until it is a uniform cylinder and more suitable for the rotary peeling process." *Id.* at 17. Thus, it appears that Commerce is supporting Chengen's yield ratio based on the amount of wood that would have to be removed prior to the peeling process. *Id.* However, as highlighted above scrap is generated in multiple additional ways during veneer production. In particular, Chengen has explained that scrap is generated in the first and second stage of peeling and that veneers undergo cutting before drying, which would also necessarily generate scrap. Coalition Letter Containing Info from Investigation at Exhibit 3.2, p. 13. Thus, to the extent that Commerce's analysis and rejection of the Coalition's argument fails to take into consideration the additional scrap generated during veneer production, it is necessarily flawed.

Commerce also claimed that the yield loss information submitted by the Coalition "appears to corroborate the data reported by Chengen{,}" suggesting that the Coalition's data regarding

[

]. IDM at 16; Memorandum from Kabir Archuletta, Program Manager, Off. V, Enf't and Compliance, to The File, re: *Certain Hardwood Plywood Products from the People's Republic of China: Business Proprietary Memorandum for the Final Results* (Nov. 23, 2020) at 1, C.R. 149, P.R. 216. This, however, misstates the information provided. In particular, as the Coalition explained, the information it provided indicated that [

]. *See*

Coalition Case Br. at 24-25. Thus, [

]. This fundamental misunderstanding by Commerce regarding these data contradicts its conclusion that the Coalition's data support Chengen's reporting.

Finally, the Coalition highlighted that certain cost elements are not captured in normal value when the calculated log FOPs are applied to the log SVs. *Id.* at 28-30. In particular, the Coalition noted that there is no evidence that the SVs for logs calculate volume in the same manner as that used by Chengen. *Id.* at 28-29. Given that there are differing measurement standards and the SV data are based on imports from different countries into Malaysia, applying SVs based on one measuring standard to FOPs derived using the Chinese measuring standard could create distorted normal values. *Id.*; *see* Chengen Supp. D QR at 15-16 (showing different log volumes calculated using different conversion formulas). Additionally, Chengen reported that it required logs from its suppliers that are custom-cut to 2.6 meters long. *See* Coalition Case Br. at 29. Obtaining such custom-sized logs would logically create additional costs that would not be reflected in the SV data. *Id.* In other words, there are additional costs associated with Chengen's logs that would not be captured by the SVs. These issues further demonstrate the relative unreliability and inaccuracy resulting from the use of log consumption data.

Commerce, however, summarily dismissed all of these arguments and failed to adequately address how the log consumption data constitute the best information available notwithstanding these issues. With respect to how volumes are measured, Commerce stated that it has "a longstanding practice" of valuing FOPs using import data and has done so in other proceedings

regarding wood products. IDM at 18. Commerce also posited that importers would not purchase from suppliers believed to be providing inaccurate volumes. *Id.* These statements miss the point. The Coalition is not arguing that import data have been misreported or are inaccurate. Instead, if Chengen's volume data are based on one conversion method while the import data are based on a different conversion method—both of which could be acceptable methods for converting log volumes—applying the SV to Chengen's FOPs would be distortive because the volumes would not be on an apples-to-apples basis. Moreover, regardless of whether Commerce has used similar data in other proceedings, its practice of doing so does not explain why its approach was reasonable here, on this record. *See CS Wind Viet.*, 832 F.3d at 1377 ("{A}n agency's statement of what it 'normally' does or has done before . . . is not, by itself, an explanation of 'why its methodology comports with the statute.'" (quoting *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1383 (Fed. Cir. 2001))). In particular, given the availability of veneer consumption data that do not suffer from the same potential distortion, Commerce's reliance on its usual practice does not explain why relying on log consumption data valued using SVs that may be based on different conversion rates constitutes the best available information. Thus, Commerce's response to this argument does not address the underlying issue or explain how the normal value calculation was not distorted given the disconnect between the SV data and the log consumption data.

Commerce similarly failed to consider the effect on cost of Chengen's custom-sized logs. Specifically, Commerce states that it cannot speculate regarding how Chengen's log-size requirement may affect log costs. IDM at 18. However, this ignores the issue. It is undisputed that Chengen requires a very specific log—one custom-cut to exactly 2.6 meters. *See* Coalition Case Br. at 29. It likewise cannot be reasonably disputed that the SV data does not specify log length and would cover a wide variety of logs in varying sizes. *Id.* As a result, it is highly unlikely that

the SV data account for costs associated with Chengen's requirements; on the other hand, this is not a problem with respect to veneer data given that they are rectangular and uniformly shaped products of standard dimensions. *Id.* at 30. Commerce's outright rejection of this issue does not provide a reasoned basis as to why potentially distorted normal values based on log data are necessarily preferable to normal values based on veneer data that do not suffer from the same shortcomings.

In sum, the Coalition identified numerous aspects of Chengen's data that contradicted the reliability of the log consumption data and Commerce's conclusion that such information constituted the best available information. These issues raise legitimate concerns regarding the accuracy of Chengen's log FOPs that Commerce failed to adequately address. Given these shortcomings in the agency's response, Commerce's conclusion that the log consumption data should be relied on is not supported by substantial evidence and is otherwise not in accordance with law. This is particularly true given the inherently increased reliability of the veneer consumption data, discussed above.

### 2.     Commerce's reliance on Chengen's log consumption data without taking additional steps to confirm it was arbitrary and capricious

Finally, Commerce's use of Chengen's log consumption data in light of its refusal to obtain additional information or undertake any type of verification was arbitrary and capricious. As noted above, Commerce recognized in its preliminary determination that good cause existed to conduct verification of Chengen specifically with respect to "the accuracy of Chengen's log volume calculation, its reported consumption rates, and its sales and accounting documentation . . . ." Prelim. Memo at 21. Indeed, Commerce stated that such actions were appropriate given the "significance of this issue" and "the disagreement between interested parties with respect to such a fundamental component of our calculation . . . ." *Id.* However, despite this recognition,

Commerce ultimately took no additional steps to verify or otherwise obtain additional information regarding Chengen's reporting. *See* IDM at 6-7. In explaining why it did not do so, Commerce stated only that verification was not possible given the current conditions stemming from the COVID-19 pandemic and that "statutory deadlines prevent us from issuing a supplemental questionnaire or postponing the final results any further . . . ." *Id.* at 7.

Given the agency's recognition of the need for verification in the preliminary determination, it was unreasonable for Commerce to continue to rely on Chengen's log consumption data without taking any additional steps to verify it or explaining why it no longer considered verification necessary. In other words, Commerce acknowledged the importance of the issue and the need to verify the accuracy of Chengen's reporting but ultimately took no steps to do so and provided no explanation as to why such steps were no longer needed. Such actions do not provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines*, 371 U.S. at 168. Once Commerce acknowledged that it was necessary to verify Chengen's log consumption and related data, it was obligated to either take steps to do so or explain why it no longer considered it necessary to do so. Commerce, however, did neither. In its final determination, Commerce did not state that good cause to verify no longer existed or provide any explanation as to why the concerns it had in the preliminary determination ceased to exist; instead, Commerce's *sole basis* for declining to obtain additional information was its statutory deadlines. IDM at 6-7.

While the Coalition understands Commerce's need to cancel in-country verification in light of the COVID-19 pandemic, Commerce could have taken other actions to obtain additional information regarding Chengen's reporting and, indeed, the Coalition outlined the very type of information the agency needed to request. *See* Coalition's Req. for SQR in Lieu of Verification at

21-26. Moreover, Commerce provided no reasonable basis for failing to do so. Although Commerce pointed to its statutory deadlines in the final determination, the Coalition's initial request for Commerce to act to verify Chengen's data was submitted *eight months* before the final determination was issued. *See id.* Additionally, Commerce formally cancelled verification *five months* before its final determination was issued.[3] Memorandum from Shawn Thomson, Director, Off. V, AD/CVD Operations, to Interested Parties, re: *Administrative Review of the Antidumping Duty Order of Certain Hardwood Plywood Products from the People's Republic of China: Cancellation of Verification and Establishment of Briefing Schedule* (June 15, 2020), P.R. 186. In other words, Commerce had ample time to collect additional information from Chengen but provided no basis for failing to do so. As such, it was unreasonable and unjustified for Commerce to use Chengen's log consumption data when it recognized the need to verify this information and had the time take steps to further scrutinize these data, but failed to take any actions to do so and failed to provide any explanation as to why it was appropriate to still rely on these data in light of its findings in the preliminary determination.

---

[3]     The Coalition notes that, at the time Commerce formally cancelled verification, the final determination was scheduled for July 27, 2020. *See* Memorandum from Eric Hawkins, Int'l Trade Compliance Analyst, Off. V, Enf't and Compliance, through Shawn Thompson, Director, AD/CVD Operations, to James Maeder, Deputy Assistant Sec'y for AD/CVD Operations, re: *Certain Hardwood Plywood Products from the People's Republic of China: Extension of Deadline for Final Results of Antidumping Duty Administrative Review, 2017-2018* (July 13, 2020), P.R. 199. However, approximately one month later, Commerce extended the final determination deadline by an additional 60 days and, 8 days later, tolled the deadline by another 60 days. *Id.*; Memorandum from Jeffrey I. Kessler, Assistant Sec'y for Enf't and Compliance, to The Record, re: *Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews* (July 21, 2020), P.R. 200.

**B.      Commerce's Assumption of 24 Working Days Per Month for Calculating the Surrogate Labor Rate Was Unsupported by Substantial Evidence and Is Not in Accordance with Law**

In its final determination, Commerce modified its approach for converting a monthly wage rate to an hourly wage rate to rely on an assumption of 24 working days per month instead of 21 working days per month. IDM at 31. According to Commerce, this was done to follow its "stated practice" and because its use of 21 working days per month in the preliminary determination was inadvertent. IDM at 31. In doing so, however, Commerce did not address the Coalition's argument demonstrating why an assumption of 21 working days was more appropriate. Coalition Rebuttal Br. at 6-7. In particular, the Coalition explained that 21 working days per month was consistent with the number of Mondays through Fridays in any given month and was still conservative as it did not account for other non-working days such as holidays, vacation, or sick days. *Id.* As Commerce failed to provide a reasoned explanation for its revised calculation and to address the argument and information on the record undermining its assumption, the agency's calculation of the hourly labor rate based on an assumption of 24 working days per month was unsupported by the record and not in accordance with law.

As has long been recognized, Commerce must explain the basis for its determinations and, while such explanations need not be perfect, the agency's "decision must be reasonably discernible to a reviewing court." *NMB Sing.*, 557 F.3d at 1319 (citing *State Farm*, 463 U.S. at 43). Moreover, "Commerce is obligated to respond to those arguments made by interested parties that bear on issues material to Commerce's determination." *Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351-52 (Ct. Int'l Trade 2020) (citing *Itochu Bldg. Prods., Co. v. United States*, 163 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2016)) (finding that Commerce failed to provide an adequate explanation where it "did not address several issues raised by Coalition that were

material to the agency's determination . . . ."). Accordingly, to provide an adequate explanation

for a determination, Commerce must provide more than conclusory statements. *See Jindal Poly*

*Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1384-85 (Ct. Int'l Trade 2019) (finding

that Commerce failed to provide a reasoned explanation where its "entire analysis for denying the

two post-sale price adjustments is comprised of conclusory statements that the adjustments did not

satisfy" certain criteria).

Commerce has failed to meet this burden here. In modifying its calculation for the final

determination, Commerce stated only that it had "inadvertently" relied on 21 working days per

month in the preliminary determination and that is has "a stated practice of assuming 24 working

days/month." IDM at 31. Commerce provided no other reasoning or discussion. *Id.*; Memorandum

from Nicolas Mayora, Int'l Trade Analyst, Off. V, Enf't and Compliance, through Kabir

Archuletta, Program Manager, Off. V, Enf't and Compliance, to The File, re: *Administrative*

*Review of Certain Hardwood Plywood Products from the People's Republic of China: Final*

*Surrogate Value Memorandum* (Nov. 23, 2020) at 2 ("Final SV Memo"), P.R. 214. Moreover,

Commerce did not address in any manner the Coalition's argument. IDM at 31; Final SV Memo

at 2. In other words, Commerce did not provide any discussion of why its calculation was

reasonable or appropriate in light of the analysis and argument presented by the Coalition, nor did

Commerce identify any errors or shortcomings in the analysis presented by the Coalition. IDM at

31; Final SV Memo at 2.

Although the agency did assert that it was following its "stated practice" in the final

determination, this statement alone does not satisfy Commerce's obligation to adequately explain

its determination. As the Court of Appeals for the Federal Circuit has explained, "an agency's

statement of what it 'normally' does or has done before . . . is not, by itself, an explanation of 'why

its methodology comports with the statute.'" *CS Wind Viet.*, 832 F.3d at 1377 (quoting *SKF USA*, 263 F.3d at 1383); *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 544 (Fed. Cir. 2019) (in explaining why Commerce's reasoning was insufficient, highlighting that a declaration regarding what the agency normally does or has done before is not an adequate explanation) (citing *CS Wind Viet.*, 832 F.3d at 1377). For example, this Court has repeatedly found that Commerce fails to adequately explain its rejection of SV data from a non-primary surrogate country where the determination is based only on the agency's preference for valuing data from a single primary surrogate. *See, e.g.*, *Diamond Sawblades Mfrs.' Coal. v. United States*, No. 17-00167, slip op. 18-146, at 25 (Ct. Int'l Trade Oct. 23, 2018) ("The regulatory preference for valuing inputs for an NME respondent's production using data from a single 'primary' surrogate country has been held insufficient to explain decisions to reject data from a non-primary surrogate country if questions remain unanswered as to the suitability of the primary surrogate country data."); *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 37 CIT 1116, 1120, 929 F. Supp. 2d 1352, 1355 (2013) ("{I}t is not sufficient for Commerce to cite the policy of using a single surrogate country where, as here, there is reason to believe that the primary surrogate country may not provide the best available information for a particular FOP").

Here, too, relying on 24 working days per month to calculate the surrogate labor rate solely because that is the agency's "stated practice" does not constitute a sufficient explanation of the agency's determination and fails to demonstrate that Commerce relied upon the best available information to value Chengen's FOPs as required by the statute. *See* 19 U.S.C. § 1677b(c)(1)(B). Notably, the document to which Commerce points in support of its stated practice also fails to provide any discussion regarding or information supporting the assumption of 24 working days per month. *Antidumping Methodologies in Proceedings Involving Non-Market Economies:*

*Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,094 & n.11 (Dep't Commerce June 21, 2011). Instead, it simply states that it relies on "the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month." *Id.* at 36,094 n.11. Nor does this explain why it is appropriate to rely on this presumption in light of the analysis presented by the Coalition, demonstrating the inherent unreasonableness in this approach. Consequently, Commerce's conclusory statement and failure to respond to the Coalition's argument render the agency's determination unsupported by substantial evidence and otherwise not in accordance with law.

C.  **Commerce's Calculation of the Surrogate Financial Ratio Using Data for Fu Yee and Ta Ann Is Unsupported by Substantial Evidence and Is Not in Accordance with Law**

Pursuant to 19 U.S.C. § 1677b, Commerce is directed to calculate normal value in an NME proceeding by using the "best available information" among the available surrogate data. 19 U.S.C. § 1677b(c)(1); *see Clearon Corp. v. United States*, 35 CIT 1685, 1686-87, 800 F. Supp. 2d 1355, 1358 (2011). This includes the information used to approximate general expenses and profit, for which Commerce usually relies on financial statements from a producer in a surrogate country. *See Clearon Corp.*, 35 CIT at 1686-87, 800 F. Supp. 2d at 1358. Commerce has developed a general framework, consistent with its overall approach to SV selection, through which it selects the financial statements for the purpose of calculating the surrogate financial ratios based on reliability, availability, quality, specificity, and contemporaneity. *See Catfish Farmers of Am. v. United States*, 33 CIT 1258, 1273-74, 641 F. Supp. 2d 1362, 1378 (2009). Moreover, Commerce has a practice of not using financial statements that show no profit or that indicate the receipt of subsidies. *See id.*; *Clearon Corp.*, 35 CIT at 1686-87, 800 F. Supp. 2d at 1358. It is within this framework that Commerce determines what constitutes the "best available information." As

discussed below, Commerce's determination here with respect to the use of certain financial

statements deviated from this practice, and the agency failed to adequately explain its

determination in light of the record as a whole. As such, Commerce failed to demonstrate that it

relied on the best available information to calculate the surrogate financial ratios.

> ### 1.    Commerce's use of Ta Ann's financial statement was unsupported and not in accordance with law in light of evidence demonstrating that the company received countervailable subsidies

As noted above, one of the criterion Commerce considers in selecting financial statements

to calculate surrogate financial ratios is whether there is evidence that the company has received

countervailable subsidies. This stems from legislative history concerning the antidumping statute

noting that "Commerce should avoid prices that 'it has reason to believe or suspect may be

subsidized.'" *Clearon Corp.*, 35 CIT at 1687, 800 F. Supp. 2d at 1358 (quoting Omnibus Trade

and Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 590 (1988) (Conf. Rep.), *reprinted

in* 1988 U.S.C.C.A.N. 1547, 1623-24 ("H.R. Rep. No. 100-576")). While Commerce is not

required to undertake a formal investigation to determine whether a financial statement is tainted

by subsidies, the agency must base its determination "on information generally available to it at

th{e} time." *Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1289 (Ct. Int'l

Trade 2020) (quoting H.R. Rep. No. 100-576 at 590-91, 1988 U.S.C.C.A.N. at 1623-24). Based

on this guidance, Commerce has developed a general framework for considering this issue, under

which it will not exclude a financial statement that merely mentions receipt of a subsidy, but will

exclude financial statements where there is a reference to a specific subsidy program found to be

countervailable in a formal countervailing duty investigation. *See Clearon Corp.*, 35 CIT at 1688,

800 F. Supp. 2d at 1359. Nonetheless, if Commerce does not adequately address information

regarding a company's potential subsidization, such a determination is not sufficiently supported.

*See Shenzhen Xinboda Indus. Co.*, 456 F. Supp. 3d at 1290-91; *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1329-33 (Ct. Int'l Trade 2018).

Here, Commerce's conclusion that Ta Ann's financial statement was not tainted by the receipt of countervailable subsidies is not supported by the record. As the Coalition highlighted in its case brief, Ta Ann's financial statement indicated that the company benefitted from tax subsidies, as evidenced from the reference to "{u}nutilised reinvestment allowance, being tax incentives that is not a tax base of an asset . . ." and an increase of 317,000 RM in reinvestment allowance in 2018 that was "recognised in profit or loss." Coalition Case Br. at 34. In rejecting this information, Commerce stated only that there was no information "as to how this reinvestment allowance constitutes a subsidy from a program that Commerce previously found to be countervailable . . ." and, consequently, the agency found that there was no basis to exclude this financial statement. IDM at 22. This, however, fails to take into consideration Commerce's prior subsidy determinations regarding Malaysia. Specifically, in its final determination in the countervailing duty investigation regarding certain frozen warmwater shrimp from Malaysia, Commerce found that certain Reinvestment Allowances under the Income Tax Act of 1967 were countervailable subsidies. Issues and Decision Memorandum accompanying *Certain Frozen Warmwater Shrimp from Malaysia*, 78 Fed. Reg. 50,381 (Dep't Commerce Aug. 19, 2013) (final affirm. countervailing duty deter.) at 11-12.[4]

---

[4]     The Coalition notes that Commerce found the Reinvestment Allowance to be countervailable with respect to the program that allowed deductions against 100% of statutory income for qualifying projects located within the states of Sabah, Sarawak, and the Eastern Corridor of Peninsula Malaysia. *Id.* at 12. The Coalition further notes that Ta Ann is located in Sarawak. Letter from deKieffer & Horgan, PLLC to Sec'y of Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Final Surrogate Value Submission* (Jan. 2, 2020) at Exhibit SV2-8, P.R. 150-153.

In light of this prior determination, Commerce's conclusory statement that Ta Ann's financial statement did contain evidence of receipt of countervailable subsidies falls short. For example, in *Jacobi Carbons AB v. United States*, the Court found that Commerce failed to sufficiently explain its conclusion that a financial statement did not contain evidence of subsidies where the agency provided only a conclusory statement in support of its determination. *Jacobi Carbons AB*, 313 F. Supp. 3d at 1329-33. In particular, Commerce had failed to address a line item in the financial statement suggesting that a subsidy may have been received and a prior agency determination ostensibly relating to the same program. *Id.* Similarly, here, Commerce provided little more than its conclusion and failed to address the information available regarding the potential subsidies identified in Ta Ann's financial statement. Thus, Commerce failed to consider information that detracted from its determination and did not adequately explain its findings; as such, its reliance on Ta Ann's financial statement was not supported by substantial evidence.

### 2. Commerce's use of Fu Yee's financial statement was unsupported and not in accordance with law in light of evidence demonstrating that the company should not be considered profitable

As explained, when selecting among possible data to be used to calculate the surrogate financial ratios, Commerce has a stated policy of not relying on financial statements that demonstrate the company had no profit. *See Ca.fish Farmers of Am.*, 33 CIT at 1273-74, 641 F. Supp. 2d at 1378. Commerce has stated that it does so because such financial statements "do not reflect the financial situation of a normal surrogate company that operates at a profit and, thus, are not an appropriate benchmark for the calculation of normal value in a non-market economy case, when other financial statements, showing profits, are available." *Id.* at 1274, 641 F. Supp. 2d at 1378. The agency has further recognized that rejection of such financial statements is appropriate given that "a company's profit amount is a function of its total expenses and, therefore, is

intrinsically tied to the other financial ratios for that company." Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets form the Socialist Republic of Vietnam*, 74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009) (final results of the AD admin. rev. and new shipper rev.) at 4 (citations omitted).

While Commerce acknowledged this practice in its determination here, it failed to properly implement it. In particular, as the Coalition explained, information contained in Fu Yee's financial statement demonstrated that the company—which, by Commerce's calculation was showing a profit of only 0.23%—should be considered unprofitable. *See* Coalition Case Br. at 34-35. In particular the Coalition highlighted the substantial amount of, and substantial increase in, Fu Yee's reported Trade and Other Payable, demonstrating that the company delayed paying substantial legitimate business expenses. *Id.* The Coalition also noted that Fu Yee reported an amount for "Hire purchase payables{,}" for which it was accumulating interest fees for failing to pay. *Id.* In other words, had Fu Yee in fact paid its legitimate business expenses that had been incurred in the relevant period, it would not show a profit. *Id.* Accordingly, the Coalition argued that Fu Yee's financial statement should not be used for the calculation of the financial ratios. *Id.*

In rejecting this argument, Commerce stated that it "does not look beyond the plain language in financial statements to speculate as to what each item includes or how each item should be treated{,}" highlighting that it does not have the authority to obtain or verify information from Fu Yee and Fu Yee's financial statements were prepared in accordance with generally accepted accounting principles and contained an unqualified auditor's opinion. IDM at 21. Commerce also disagreed that Fu Yee's financial statement indicated that it incurred a late fee as a result of overdue payments or that it would be appropriate to treat outstanding payable amounts "essentially as a write-off." *Id.* Thus, it continued to rely on Fu Yee's financial statement.

The response provided by Commerce fails to adequately address the Coalition's argument or demonstrate that relying on Fu Yee's financial statement is support by substantial evidence. With respect to Commerce's initial response, that it does not "look beyond the plain language of the financial statement{,}" *id.*, the agency misunderstands the Coalition's argument. The Coalition's argument did not require Commerce to look beyond the plain language of Fu Yee's financial statement, obtain additional information from the company, or find that the financial statement was improperly prepared. *See id.* Instead, the Coalition's argument required Commerce to consider all the information contained in Fu Yee's financial statement as a whole and the implications of such information.

Moreover, beyond stating that it will not "look behind the plain language{,}" Commerce provided no explanation as to why it is appropriate the treat Fu Yee as profitable in light of the record as a whole. As an initial matter, as noted above, simply stating what the agency typically does or has done in the past does not constitute a sufficient explanation of its determination. *See CS Wind Viet.*, 832 F.3d at 1377. Thus, the fact that Commerce typically does not take into account elements such as trade payable into its analysis is not, in and of itself, a basis for failing to do so here. Notably, as highlighted in the Coalition's case brief, not only did Fu Yee's trade and other payables grow significantly between 2017 and 2018, notwithstanding almost identical revenues and direct material costs, but its reported trade and other payables in 2018 were more than 25 times the company's reported profit. Coalition Case Br. at 34. In other words, the only reason why Fu Yee was able to show the minimal profit that it did was that payment for a substantial amount of goods and services has not yet come due. In other words, had Fu Yee paid even a small portion of its outstanding trade payables incurred during the relevant period, it would not have shown a profit. Such a financial situation indicates that the company does not "reflect the financial situation of a

normal surrogate company that operates at a profit . . . ." *Catfish Farmers of Am.*, 33 CIT at 1274, 641 F. Supp. 2d at 1378. In light of the specific financial situation of the company at issue here, and the information tending to detract from Commerce's determination that it is appropriate to use Fu Yee's financial statement, the agency was obligated to address this argument in a meaningful way. Simply stating that it does not and will not consider such information does not meet this burden.

## VI.  **CONCLUSION**

For the reasons provided above, the Coalition respectfully requests that the Court remand Commerce's determination regarding its calculation of the dumping margin in the first administrative review of the antidumping duty order on hardwood plywood from China.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.
Jeffrey O. Frank, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Coalition for Fair Trade
in Hardwood Plywood*

Date:  June 24, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Coalition for Fair Trade in Hardwood Plywood's Memorandum in Support of Rule 56.2 Motion for Judgment upon the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 12,984 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

Coalition for Fair Trade in Hardwood Plywood
(Representative Of)

June 24, 2021
(Date)