## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Jennifer Choe-Groves, Judge**

COALITION FOR FAIR TRADE IN
HARWDOO PLYWOOD,

        Plaintiff,

  and

XUZHOU JIANGHENG WOOD
PRODUCTS CO., LTD., et al.,

        Consolidated Plaintiffs,

  v.

UNITED STATES,

        Defendant,

  and

LINYI CHENGEN IMPORT & EXPORT
CO., LTD., et al.,

        Defendant-Intervenors,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Consol. Court No. 20-03930

## CONSOLIDATED PLAINTIFFS' REPLY BRIEF

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
**DeKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiffs*

Dated: October 20, 2021

# TABLE OF CONTENTS

I.     **The Department's Selection of the Logs Surrogate Value is Not Supported by Substantial Evidence** ............................................................................................... 1

II.    **The Department's Selection of the Formaldehyde Surrogate Value is Not Supported by Substantial Evidence** ............................................................ 7

III.   **The Department's Selection of the Labor Surrogate Value is Not Supported by Substantial Evidence** ....................................................................................... 9

IV.   **Conclusion and Prayer for Relief** ............................................................. 11

## TABLE OF AUTHORITIES

**Cases**

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)............................................7

*Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312 (Ct. Int'l Trade 2016)...................4

*Camau Frozen Seafood Processing Import Export Corp. v. United States*, 929 F. Supp. 2d
1352 (Ct. Int'l Trade 2013)........................................................................................................5

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)........................................7

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344 (April 19, 2018) .............................6

*Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94 (Ct. Int'l Trade
Aug. 21, 2015) ............................................................................................................................6

*Peer Bearing Co.-Changshan v. United States*, 804 F. Supp. 2d 1337 (Ct. Int'l Trade 2011)........5

*Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade
2004) ............................................................................................................................................6

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)...................................................4

**Administrative Decisions**

*Fresh Garlic from the People's Republic of China: Preliminary Results, Preliminary
Rescission, and Final Rescission, In Part, of the 24th Antidumping Duty Administrative
Review; 2017-2018*, 85 Fed. Reg. 2,400 (January 15, 2020)..........................................................4

Consolidated Plaintiffs Xuzhou Jiangheng Wood Products Co., Ltd. ("Xuzhou Jiangheng"), and Xuzhou Jiangyang Wood Industries Co., Ltd. ("Xuzhou Jiangyang") and Consolidated Plaintiff-Intervenor Linyi Chengen Import and Export Co., Ltd ("Chengen"), ("Chengen Plaintiffs") hereby file their reply brief responding to the Defendant United States' and Defendant-Intervenors' response briefs.  *See* U.S. Br. (September 22, 2021); Def-Int. Br. (September 22, 2021); *see also Certain Hardwood Plywood Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2017-2018,* 85 Fed. Reg. 77,157 (December 1, 2020), *incorporating* Issues & Decision Memorandum ("IDM").

**I.    The Department's Selection of the Logs Surrogate Value is Not Supported by Substantial Evidence.**

The Department relied upon Malaysia GTA import data reported on an M3 basis to value Chengen's primary raw materials, poplar logs and birch logs.  *See* Final SV Memo at Summary tab; PD214-215.  Chengen raised two issues with this determination.  First, record evidence supports an inherent issue in the M3 quantity reported in the GTA data.  Chengen argued this can be remedied using the Malaysian UN Comtrade data.  Second, Chengen maintained that given the very low quantity of imports into Malaysia for this critical surrogate value, the Romanian log import values are another *better* reliable alternative dataset.  *See* Chengen R56.2 Br. at 9-14.  The United States dismisses both of these arguments.

First, the United States claims that Chengen has not substantiated its argument that the M3 quantity reported in the GTA data is distorted.  As demonstrated in Chengen's R56.2 brief, the UN Comtrade data presents the data on a KG basis and therefore using these two sources, the conversion between KG and M3 of the Malaysian import statistics can be determined.  The conversion shown was 2,267 KG/M3 and 2,688 KG/M3— a wholly unreasonable conversion given the density of poplar and birch is around 425 KG/M3 and 670 KG/M3, respectively.

1

Chengen R56.2 Br. at 10.  Despite this information, the United States claims the argument is inherently flawed because it presumes the reliability of the UN Comtrade data over the GTA data.  U.S. Br. at 35.  Notably, Chengen already addressed this line of argument in its R56.2 brief and the United States failed to address Chengen's further argument.  As explained, logs are not in fact measured on an M3 or other volume basis.  In other words, the logs are not placed in water to determine their actual M3 volume displacement.  Rather logs are weighed or the M3 volume is calculated using a formula.  Therefore, the Malaysian GTA import statistics include an apparent error in the M3 *calculated* volume.  To remedy this error, Chengen proposed that the Department could use the KG basis Malaysian import data and the record documented average density of poplar and birch, from which a more accurate surrogate value can be calculated. Chengen R56.2 Br. at 11.  The resulting surrogate value is very similar to Romania, further corroborating the accuracy of this approach over the reliance on the GTA M3 data.  As weighing/weight is a straight-forward measurement on a scale and as KG is perhaps the most common unit of measurement for imports into all countries generally, it certainly is presumptively more accurate than a calculation that includes multiple unstated factors from which it is derived.

Second, the United States dismisses Chengen's argument regarding the low quantity of imports of logs into Malaysia.  Chengen argued that in the alternative to relying upon the Malaysia UN Comtrade log import values, the Department could rely upon the Romanian import statistics.  The United States first dismisses this on its face claiming that Romania is not economically comparable to China and since there is "suitable" surrogate data in Malaysia, it will not depart from the primary surrogate country, Malaysia.  U.S. Br. at 36.

Every year, the Department issues a surrogate country list with a selection of countries with closest *per capita* GNI to China that the Department purports are most likely to have good data and availability. *See* Dep't SV Deadline Memorandum (August 16, 2019) at Attachment 1. Romania was not on the surrogate country list based on 2018 GNI issued in this review, but was on the surrogate country list based on the 2017 GNI list—as noted below, the period of review covers both 2017 and 2018. Nonetheless, in each review, the Department also provides parties with the opportunity to "propose for consideration other countries that are at a level of economic development comparable to China." *Id*. Chengen timely submitted that Romania should be considered at the same level of economic development not only based on the 2018 GNI, but also based on the 2017 GNI.

Chengen demonstrated that Romania's difference of only $1820 per capita GNI from China's per capita GNI in 2018, should still render Romania at the same level of economic development based on past GNI bands relied upon by the Department. *See* Chengen GNI SC Comments at 2 (explaining that the Department had recent GNI bands with countries on the list with an over $2,000 difference with China). Moreover, the Department has found that Romania should be considered at the same level of economic development as China for reviews that overlap 2017 and 2018. Specifically, in *Fresh Garlic from China*, the Department found that all countries on the Department's surrogate country based on 2017 GNI and 2018 GNI were equally comparable to China for purposes of the 2017-2018 review:

> As enumerated above, Commerce identified Brazil, Mexico, Romania, Bulgaria, Turkey, Russia, Malaysia, and Kazakhstan, as countries with per capita GNI that are at the same level of economic development as China during the POR. We consider all eight countries identified on the 2017 Surrogate Country List and 2018 Surrogate Country List as having met this prong of the surrogate country selection criteria.

> Countries on the segment record that are at the same level of economic development as China are given equal consideration for the purposes of selecting a surrogate country.

*Fresh Garlic from the People's Republic of China: Preliminary Results, Preliminary Rescission, and Final Rescission, In Part, of the 24th Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 2,400 (January 15, 2020) and accompanying Prelim. Decision Memo at 28 (unchanged in final).

The review of *Fresh Garlic from China* covered the period of November 2017 through October 2018.  Even though, like in the instant review of *Hardwood Plywood*, the majority of the POR was in 2018 and not 2017, the Department still found Romania was at the same level of economic comparability[1].  Therefore, Romania must be considered to be at the same level of economic comparability as Malaysia and other countries on the 2018 GNI list.  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").

Further, the standard for selecting surrogate values is not merely that the data be "suitable."  The Department must rely upon the best available information.  The Court has criticized the Department in the past for not properly comparing all surrogate data on the record because of its "preference" to rely upon a single surrogate country.  *See Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327-28 (Ct. Int'l Trade 2016) ("Commerce, by relying on its single surrogate country preference and nothing more, improperly rejected other SVs for

---

[1] Chengen also notes that like in this review, in *Fresh Garlic from China,* the Department only issued a surrogate country list based on 2018 GNI (which excluded Romania), but then nonetheless found in the Preliminary Results that Romania was at the same level of economic comparability based on the 2017 GNI list and overlapping POR.

anthracite coal derived from POR6-contemporaneous data from other countries. This 'preference'. . . carries the day only when it is used to 'support a choice of data as the best available information where the other available data 'upon fair comparison, are otherwise seen to be fairly equal''") *quoting Peer Bearing Co.-Changshan v. United States*, 804 F. Supp. 2d 1337, 1353 (Ct. Int'l Trade 2011)); *see also Camau Frozen Seafood Processing Import Export Corp. v. United States*, 929 F. Supp. 2d 1352, 1355, (Ct. Int'l Trade 2013) ("it is not sufficient for Commerce to cite the policy of using a single surrogate country where, as here, there is reason to believe that the primary surrogate country may not provide the best available information for a particular FOP"); *Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353, 1373 (Ct. Int'l Trade 2011) ("because  the statute requires Commerce to compare the chosen data set with other data sets on the record and thereby determine what is the best available information, the regulatory preference cannot suffice as adequate reasoning if it is the only factor that Commerce considers"), *vacated on other grounds*, 766 F.3d 1396 (Fed. Cir. 2014).

Next, the United States claims that even if considering the Romanian data as an alternative, the presence of low quantities alone in Malaysia does not impugn the surrogate data and criticized Chengen for not providing Commerce's preferred background data to make an aberrancy analysis.  The Department made the same claim in its IDM, which Chengen addressed in its opening brief.  As explained, Chengen did not argue that the Malaysian log prices were aberrant before the Department.  Chengen made a distinct, different argument that the quantity is too small for the AUV to be a commercial value and a representative surrogate value.  Chengen, and any manufacturer, purchases their primary raw materials in large commercial quantities. Large commercial quantities generally have lower prices (and more consistent pricing) than small quantity purchases.  Stemming from this logic, the commercial quantity test has developed

for determining whether a surrogate value is reliable indicator of whether the price is commercial, as endorsed in several opinions of this Court. *See* Chengen R56.2 Br. at 12-13; *citing Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361-1362 (April 19, 2018) ("Commerce's conclusory assertion regarding the significance of the imports into Thailand fails to apprise the court why 122 metric tons is sufficiently significant to yield a representative price in light of respondents' production experience."), *Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (Ct. Int'l Trade Aug. 21, 2015) (finding the Department's refusal to consider the respondent's actual purchasing and consumption quantity at odds with the Department's practice regarding other surrogate values and the statutory objective in general, maintaining that, "the commercial significance of import statistics is not something in the abstract, they must be reflective of, if not 'exactly' reflecting, such significance in comparison with actual experience, of the producers or exporters of the input under consideration, to the extent possible."), *Shanghai Foreign Trade Enters. Co. v. United States*, 28 C.I.T. 480, 495 (2004) ("The Commerce decision fails to establish that the small amount of pig iron imported by India during the period of investigation was statistically or commercially significant and demonstrates no apparent consideration of that issue. Commerce did not address the issue whether the Indian Import Statistics were based on too small a sample to be reliable.")

In the 18-month POR, Malaysia imported a mere 75 M3 of birch logs under HTS 4403.95.1000. The imports came from only one country, Latvia, during only one month of the POI, April 2018. Likewise, Malaysia imported a mere 59 M3 of poplar logs under HTS 4403.97.1000 which were from only one country, Belgium, during only one month of the POI, June 2018. These are not commercial quantities based on the larger quantities imported into Romania, particularly for poplar logs, and the quantity consumed by Chengen. *See* Chengen

R56.2 Br. at 12.  Further, the fact that such a small quantity for a major raw material was also imported only during one month of the POR further renders it atypical of commercial practice. These Malaysian values can hardly be considered contemporaneous with the POR when only imported during one month of an 18-month POR.  Even if the Court finds this information does not necessarily impugn the Malaysian data, this information must be properly considered in whether the Department relied upon the best available information to value Chengen's primary two raw materials.  *Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006) ("The term 'best available' is one of comparison, i.e., the statute requires Commerce to select, from the information before it the best data for calculating an accurate dumping margin.");  *see also Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (The Department must consider the entire record as a whole "including whatever fairly detracts" from its decision or the "evidence opposed to [its] view.").

For all the reasons above, the Court should compel the Department to make comparisons of record evidence and support with substantial evidence its conclusion as to which data source is the "best."  Therefore, the Court should order the Department to reconsider its log surrogate value determination, and consider both using the KG import values or the Romanian import values as the best available information to value this factor of production.

## II.     The Department's Selection of the Formaldehyde Surrogate Value is Not Supported by Substantial Evidence.

In the Final Results, the Department determined it was uncertain as to the type of formaldehyde that Chengen used, and found it reasonable to rely on both HTS 2912.11.10 and 2912.11.90 for the surrogate value per unit of consumption of this input.  Chengen provided three test reports of its own formaldehyde input as purchased during the POR that proved its formaldehyde meets the definition of formalin.  In response, the United States attempts to

undermine this definitive evidence claiming that the rest reports "were not accredited to any testing agency" and did not specifically say they pertained to Chengen.  U.S. Br. at 39.  Such arguments must fail.  Chengen submitted these three test reports, stating that it was information on its own formaldehyde input used during the POR to support the classification of the input as formalin.  *See* Chengen Rebuttal SVs (September 23, 2019) at 1, Exhibit List, and Exhibit SVR-3.  The tests are dated in the POR.  Chengen removed the name of the producer and testing agency to make the document a public document, as surrogate value submissions are generally public and such information was not relevant to demonstrate the percentage of formaldehyde in its input.  These tests was placed on the record on September 23, 2019, four months before the preliminary results and over a year before the final results, and the Department never issued any questionnaires on Chengen's formaldehyde input or raised any doubt with Chengen's certified statements that its input has 37% Formaldehyde (i.e. meeting the definition of formalin).  Indeed, in the Preliminary results, the Department did classify Chengen's input as formalin.

Chengen also notes that the Department does not normally require detailed documentary evidence to support a respondent's FOP descriptions.  Chengen explained the nature or definition of its FOPs in its Section D and surrogate value submissions, and such submissions are accompanied by a certification from Chengen to its accuracy.  The Department normally accepts such descriptions and then endeavors to find the best available information to value each input.  For example, Chengen described its poplar log and birch log inputs and described that its nail input was made of steel, and the Department never doubted these statements.  If the Department has further questions concerning the descriptions, the Department issues a supplemental questionnaire.  For example, in several reviews of *Crystalline Silicon Photovoltaic Cells from China*, the Department has issued supplemental questionnaires on the nature of inputs when it

was uncertain whether the HTS recommended by the respondent was correct.  For the Court's convenience, we have provided an example at **Attachment 1**.  The Department did not do so here and points to no information to undermine Chengen's statements and evidence that its formaldehyde input has a 37% concentration and is classified as formalin.  Therefore, HTS 2912.11.10, which is specific to formalin, is the most specific HTS to value this input and is the best available information.

III. **The Department's Selection of the Labor Surrogate Value is Not Supported by Substantial Evidence.**

In the Final Results, the Department relied upon the Malaysian wage data from "Trading Economics."  IDM at 30.  As argued in Chengen's R56.2 brief, the record contained a more specific and contemporaneous labor rate sourced from the Malaysian Department of Statistics ("MMS labor rate") that the Department relied upon in the Preliminary Results.  The parties do not dispute that the MMS labor rate is more specific than the Trading Economics labor rate.  The MMS labor rate is specific to the "Manufacture of Veneer Sheets and Plywood" while the Trading Economics labor rate is a broad labor rate covering all manufacturing industries, from high technology computer manufacturing to the agricultural industry.  The parties also have not disputed that the MMS labor rate is contemporaneous with the entire 18-month POR while the Trading Economics labor rate covers only 6-months of the POR.  Therefore, the MMS labor data is superior to the Trading Economies data on two key surrogate value quality components.

However, the Department, as supported by the United States and Defendant-Intervenor, maintains that the MMS labor data cannot be relied upon because it may include wages for part-time workers which would not allow the Department to calculate a reliable hourly rate as these workers work less than eight hours a day.  As explained by Chengen, the Department can still make a reasonable estimation of the hours covered by the labor data and calculate a reliable

surrogate value for labor—indeed, the Department must make an assumption from both datasets as to the number of hours covered by the labor rate. *See* Chengen R56.2 Br. at 5-6 (detailing the Department's normal labor rate calculation and the inherit assumptions the Department already makes).

Most critically, while there may be some part-time workers included in the MMS labor data, the record contains absolutely no support for the United States' statement that the Trading Economics data "did not suffer from the same deficiencies as the Malaysia Department of Statistics data." U.S. Br. at 41. Trading Economics, provides absolutely no information on whether it does or does not also include part-time employees. The mere two-page Trading Economics webpage printout provides absolutely no description about the data or even its source. *See* Pet. Prelim. SVs at M-3; PD109-115. The Trading Economics data only provides that the labor rates are an average monthly wage in manufacturing. The source provides no definition of what employees are covered by this wage data. The Department has no evidence to support the contention that the Trading Economics data does not suffer the same deficiency as the MMS labor data.

Indeed, there is absolutely no information on what is included in the Trading Economics "wages" or any suggestion that this includes the broad breadth of benefits that the Department seeks to cover in the labor rate. In contrast, the MMS data affirmatively explains that the salaries & wages paid includes "cash payments, including bonuses, commissions, overtime wages, cost of living allowances and other allowances made to all employees during the reference month. The employees' contribution to Employees' Provident Fund (EPF) and Social Security Organisation (SOCSO) is included…" Chengen Rebuttal SVs at Exhibit SVR-4; PD120. The mere two-page Trading Economics webpage printout does not even provide the underlying

source of the data, as noted.  In contrast, the MMS data is sourced directly from official

government statistics and includes details on the coverage of the data and how it was collected.

Therefore, the Department's determination that the Trading Economics data, which provides no

information on its source or coverage, is superior is arbitrary and completely unsupported by the

record.  In short, the MMS data is what a reasonable decider of the facts would conclude is the

best available information for the surrogate value of the labor input to production.

## IV.     Conclusion and Prayer for Relief

In light of the foregoing, the Department's *Final Results* were not supported by

substantial evidence or in accordance with the law.  The Chengen Plaintiffs respectfully request

that the Court remand this case for redetermination of the issues presented in its opening brief.

<div style="margin-left:40%">

Respectfully submitted,

 /s/ Gregory S. Menegaz

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*

*Admitted to California Bar; practice supervised by
attorneys of the firm who are active D.C. Bar members
pursuant to D.C. Bar Rule 49(c)(8).

</div>

Date: October 20, 2021

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **3,357** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiffs*

1

Attachment 1

Barcode:4060923-01 A-570-979 REV - Admin Review 12/1/18 Int'l Trade Administration

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979
Administrative Review
12/01/2018 - 11/30/2019
**Public Document**
ITA/E&C/Office IV:  EB

December 2, 2020

Risen Energy Co. Ltd. (Risen Energy)
c/o Gregory S. Menegaz
deKieffer & Horgan, PLLC
1090 Vermont Avenue, NW, Suite 410
Washington, DC 20005

Dear Mr. Menegaz:

This letter concerns the antidumping duty (AD) administrative review of crystalline silicon photovoltaic solar cells from the People's Republic of China (China), covering the period December 1, 2018 through November 30, 2019, and your client, Risen Energy Co. Ltd. (Risen Energy) and its affiliates (collectively Risen).  The Department of Commerce (Commerce) has reviewed Risen Energy's responses to Commerce's supplemental questionnaire and has identified certain areas that require additional information.  *See* Attachment.  The additional information requested in the attachment to this letter is due by the close of business on **December 9, 2020**.

Commerce must conduct this administrative review in accordance with statutory and regulatory deadlines.  If you are unable to respond completely to every question in the attached supplemental questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the supplemental questionnaire response.  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a supplemental questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request.  Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Pursuant to 19 CFR 351.302(d), any information submitted

after this date will be untimely filed and may be rejected and removed from the record. In such case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available.

The information you submit may be subject to verification. Failure to allow verification of any item may affect the consideration that we will accord to that item or to any other material, whether or not we verify the latter. In all cases where we have requested a re-submission of data, you should ensure that we receive information in the same format that was requested in the original questionnaire.

If you have any questions on this matter, please contact Elizabeth Bremer at (202) 482-4987 or by e-mail at Elizabeth.Bremer@Trade.Gov.

Sincerely,

FOR Howard Smith
Program Manager
AD/CVD Operations, Office IV

Enclosure

Barcode:4060923-01 A-570-979 REV - Admin Review 12/1/18 - 11/30/19

<u>December 2, 2020 Supplemental Questionnaire</u>

Risen Energy Co. Ltd. (Risen Energy)

Please ensure that all documents submitted to the Department of Commerce (Commerce) are translated fully into English and ensure their legibility.  Risen Energy should repeat the question in full to which it is responding in its narrative submission and place its answer directly below it.  Risen Energy should also fully answer each question in this supplemental questionnaire.  Please ensure that Risen Energy provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

Identifying Inputs

1. Diluent
   a. Does your diluent contain more than 25 percent by weight of one or more aromatic or modified aromatic substance?
2. Dye
   a. Does your plastic dye contain 80 percent or more by weight of titanium dioxide calculated on the dry matter?
3. Kraft Paper
   a. Is your kraft paper condenser paper or wrapping paper?
4. Tin Ribbon
   a. Is the thickness of the tin ribbon 5 mm or more?
5. Gas
   a. Regarding Exhibit D-2 FOB database of Cell and Exhibit D-2 FOP database of Module, for all inputs for gas, please describe each input and specify the type and form of the gas as purchased.
6. Regarding Exhibit D-2 FOB database of Cell and Exhibit D-2 FOP database of Module, please provide the full name and descriptions of the following inputs:
   a. A_RWALUM
   b. R_TDROSS
   c. R_RTDROSS
   d. CB_TDROSS
   e. R_RTWASTE
   f. R_RCWASTE

Case 1:20-cv-03930-JCG   Document 41   Filed 10/20/21   Page 20 of 27

Barcode:4086915-01 A-570-979 REV - Admin Review 12/1/18 - 11/30/...

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979
Administrative Review
12/01/2018 - 11/30/2019
**Public Document**
ITA/E&C/Office IV:  EB

February 5, 2021

Risen Energy Co. Ltd. (Risen Energy)
c/o Gregory S. Menegaz
deKieffer & Horgan, PLLC
1090 Vermont Avenue, NW, Suite 410
Washington, DC 20005

Dear Mr. Menegaz:

This letter concerns the antidumping duty (AD) administrative review of crystalline silicon photovoltaic solar cells from the People's Republic of China (China), covering the period December 1, 2018 through November 30, 2019, and your client, Risen Energy Co. Ltd. (Risen Energy) and its affiliates (collectively Risen).  The Department of Commerce (Commerce) has reviewed Risen Energy's responses to Commerce's supplemental questionnaire and has identified certain areas that require additional information.  *See* Attachment.  The additional information requested in the attachment to this letter is due by the close of business on **February 12, 2021.**

Commerce must conduct this administrative review in accordance with statutory and regulatory deadlines.  If you are unable to respond completely to every question in the attached supplemental questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the supplemental questionnaire response.  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline.  Statements included within a supplemental questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request.  Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request.  Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations.  An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Pursuant to 19 CFR 351.302(d), any information submitted

after this date will be untimely filed and may be rejected and removed from the record.  In such case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination.  Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available.

The information you submit may be subject to verification.  Failure to allow verification of any item may affect the consideration that we will accord to that item or to any other material, whether or not we verify the latter.  In all cases where we have requested a re-submission of data, you should ensure that we receive information in the same format that was requested in the original questionnaire.

If you have any questions on this matter, please contact Elizabeth Bremer at (202) 482-4987 or by e-mail at Elizabeth.Bremer@Trade.Gov.

Sincerely,

FOR Howard Smith
Program Manager
AD/CVD Operations, Office IV

Enclosure

2

Barcode:4086915-01 A-570-979 REV - Admin Review 12/1/18 - 11/30/19

<u>Surrogate Value Supplemental Questionnaire</u>

Risen Energy Co. Ltd. (Risen Energy)

Please ensure that all documents submitted to the Department of Commerce (Commerce) are translated fully into English and ensure their legibility.  Risen Energy should repeat the question in full to which it is responding in its narrative submission and place its answer directly below it.  Risen Energy should also fully answer each question in this supplemental questionnaire.  Please ensure that Risen Energy provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

Identifying Inputs

1. Aluminum Paste
   a. Is your aluminum paste an article of precious metal or an article clad with precious metals?
2. Ethyl Alcohol
   a. Is your ethyl alcohol a denatured ethyl alcohol, including methylated spirits?
   b. Is it denatured to the satisfaction of the Director General of Customs?
3. Glycol
   a. Is your glycol a polytetramethylene ether glycol?
4. Mixed Fluid
   a. Does your mixed fluid include methylated spirits?
5. Polyester Ribbon
   a. Is your polyester ribbon made of yarn, articles of yarn, strip or the like of heading 54.04 or 54.05, twine, cordage, rope or cables, not elsewhere specified or included?
   b. Is your polyester ribbon made of narrow woven fabric of manmade fibers?
   c. Is your polyester ribbon made of plastics?
   d. Is your polyester ribbon cellular or noncellular?
   e. Is your polyester ribbon rigid?
   f. What is the thickness of your polyester ribbon?
6. Round Copper Wire for Electrical Purpose
   a. Is your round copper wire for electrical purpose made of wire of copper-nickel base alloys (cupro-nickel) or copper-nickel-zinc base alloys (nickel-silver)?
7. Tin Bar
   a. Is your tin bar a soldering bar?
8. Xylene
   a. Is your xylene a xylol (xylene) or a mixed xylene isomer?
   b. Please explain the difference and why your xylene fits the criteria of one.
   c. Please provide supporting documentation

3

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979
Administrative Review
12/01/2017 - 11/30/2018
**Public Document**
ITA/E&C/Office IV:  JDP

January 3, 2019

Risen Energy Co. Ltd. (Risen Energy)
c/o Gregory S. Menegaz
deKieffer & Horgan, PLLC
1090 Vermont Avenue, NW, Suite 410
Washington, DC 20005

Dear Mr. Menegaz:

This letter concerns the antidumping duty (AD) administrative review of crystalline silicon photovoltaic solar cells from the People's Republic of China (China), covering the period December 1, 2017 through November 30, 2018, and your client, Risen.  The Department of Commerce (Commerce) has reviewed Risen Energy's responses to Commerce's AD questionnaires and has identified certain areas that require additional information.  *See* Attachment.  The additional information requested in the attachment to this letter is due by the close of business on **January 10, 2019**.

Commerce must conduct this administrative review in accordance with statutory and regulatory deadlines.  If you are unable to respond completely to every question in the attached supplemental questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the supplemental questionnaire response.  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline.  Statements included within a supplemental questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request.  Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request.  Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations.  An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Pursuant to 19 CFR 351.302(d), any information submitted after this date will be untimely filed and may be rejected and removed from the record.  In such

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available.

The information you submit may be subject to verification.  Failure to allow verification of any item may affect the consideration that we will accord to that item or to any other material, whether or not we verify the latter.  In all cases where we have requested a re-submission of data, you should ensure that we receive information in the same format that was requested in the original questionnaire.

If you have any questions on this matter, please contact Jeff Pedersen at (202) 482-2769 or by e-mail at Jeffrey.Pedersen@Trade.Gov.

Sincerely,

Howard Smith
Program Manager
AD/CVD Operations, Office IV

Enclosure

Barcode:3926823-01 A-570-979 REV - Admin Review 12/1/17 - 11/30/18

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

1. The Section D questionnaire requested that you identify the length of time you have been purchasing solar cells and/or modules from the supplier.  Risen failed to do so.  For each unaffiliated supplier of solar cells and solar panels, please identify the length of time you have been purchasing solar cells and/or panels from the supplier.

2. Please suggest an HTS classification for the following inputs:
   a. Scale Inhibitor
   b. Aluminum Paste

3. You have identified consumption for the following inputs, but Commerce is unable to locate a description or a suggested HTS category for each item.  Please identify and fully describe what each input is and suggest an HTS category or other surrogate value for each input.
   a. A_RWALUM
   b. A_WALUM
   c. CB_TCAKE
   d. R_TCAKE
   e. R_TWASTE
   f. R_CWASTE
   g. R_RCWASTE
   h. R_RTWASTE

4. Aluminum Extrusion:
   a. Does your aluminum extrusion have a round cross-section?
   b. Is your aluminum extrusion made of "high-strength heat-treatable alloy," which contains by weight 7.0 percent or less of copper or 10.0 percent or less of zinc, and/or designated as series 2xxx and 7xxx (except 7072) in the Aluminum Association's specifications of registered alloys?
   c. Is your aluminum extrusion a "high-strength heat-treatable alloy," which contains by weight 3.0 percent or less of magnesium and 3.0 or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloys?

5. Aluminum Frame:
   a. Does your aluminum frame have a round cross-section?
   b.  Is your aluminum frame made of "high-strength heat-treatable alloy," which contains by weight 7.0 percent or less of copper or 10.0 percent or less of zinc, and/or designated as series 2xxx and 7xxx (except 7072) in the Aluminum Association's specifications of registered alloys?
   c.  Is your aluminum frame a "high-strength heat-treatable alloy," which contains by weight 3.0 percent or less of magnesium and 3.0 or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloys?
   d. In your previous response, you said that aluminum frame is a further processed version of aluminum extrusion in that is cut to length. Are there other ways that the aluminum frame is further processed from its aluminum extrusion stage?

Barcode:3926823-01 A-570-979 REV - Admin Review 12/1/17 - 11/30/18

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

    e.   What use does the aluminum frame serve in the process? Is it used as a support in a structure? If so, in what kind of structure, or as what kind of structure is the aluminum frame used?

6.   Cable for junction box:

    a.   In your previous response to provide dimensions of the cable wire for junction box, you responded that it is 12 AWG. In order to calculate the dimensions of the cable wire from that information, Commerce used the following chart (http://www.ohmslawcalculator.com/awg-wire-chart) to determine that a 12 AWG corresponds to 2.0523 mm in diameter. According to this information, a 12 AWG wire would NOT fall into either one of the following categories below. Is this correct?

        i.   22 AWG (0.643mm in diameter) and finer but larger than 33 AWG (0.18mm in diameter).

        ii.   33 AWG (0.18 mm in diameter) and finer

    b.   If the calculated diameter length for the cable according to the chart is not correct, please provide the correct diameter length for the cable for junction box.

    c.   Is your cable for junction box made of winding copper wire?

    d.   Is your cable for junction box a coaxial cable or any other coaxial electric conductor?

7.   Diode:

    a.   Is your diode a zener diode?

    b.   Is your diode a microwave diode?

    c.   Does your diode have a maximum current of 0.5 A or less?

8.   Flocking Additive:

    a.   Is your flocking additive a prepared binder for foundry molds or cores?

    b.   Is your flocking additive a chemical product and/or preparation of the chemical or allied industries (including those consisting of mixtures of natural products)?

    c.   Is your flocking additive composed of non-agglomerated metal carbides mixed together or with metallic binders?

    d.   Please provide the full chemical contents of your flocking additive in order to help classify its HTS.

    e.   What is the flocking additive flocking? How is the flocking additive used as a surface-active preparation? Please provide full details.

9.   Insulation materials:

    a.   Do your insulation materials have polyethylene in its primary form that has a specific gravity of more or less than 0.94?

    b.   Do your insulation materials have polyethylene in its primary form that has a relative viscosity of more or less than 1.44?

    c.   Do your insulation materials have polyethylene in its primary form that is linear low density polyethylene?

    d.   Do your insulation materials have polyethylene in its primary form that is low density polyethylene?

Barcode:3926823-01 A-570-979 REV - Admin Review 12/1/17 - 11/30/18

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

e. Do your insulation materials have polyethylene in its primary form that is medium density polyethylene?

10. Phosphoric Acid:
   a. Is your phosphoric acid fertilizer grade?
   b. Does your phosphoric acid contain less than 65 percent available diphosphorous pentaoxide or its equivalent?
   c. Is your phosphoric acid a polyphosphoric acid?

11. Plaster Base putty:
   a. Is your plaster base putty a mastic?
   b. Does your plaster base putty contain caulking compounds?
   c. Can your plaster base putty be called a painter's filling?

12. Sedimentation agent:
   a. Is your sedimentation agent elastomeric?
   b. Does your sedimentation agent contain monomer units which are aromatic or modified aromatic, or which are obtained, derived or manufactured in whole or in part therefrom?
   c. Is your sedimentation agent thermoplastic?
   d. Is your sedimentation agent thermosetting?
   e. Does your sedimentation agent contain the following chemical content: Poly(nitrilomethanetetraarylnitrilo- [2,4,6-tris-(1-methyethyl)-1,3- phenylene]]-2,6-bis(1-methylethyl)- phenyl]-ω-[[[2,6-bis(1-methylethyl)-phenyl]amino]methylene]amino carbodiimide or 2,4-diisocyanate-1,3,5-tris(1-methyl- ethyl) homopolymer with polyethylene?
   f. Does your sedimentation agent contain the following chemical content: 1,1'-Bis(methylenedi-4,1-phenylene)- 1H-pyrrole-2,5-dione, copolymer with 4,4'-methylenebis(benzeneamine); and Hydrocarbon novolac cyanate ester?

13. Wire for ingot cutting (Steel-cutting wire):
   a. Is your wire for ingot cutting a silico-manganese steel?
   b. Is your wire a high-speed steel?
   c. Is your steel wire plated or coated with copper?
   d. If your steel wire is a silico-manganese steel, does it contain by weight less than 0.20 percent of carbon, more than 0.9 percent of manganese, and more than 0.6 percent of silicon, and suitable for electric arc welding?
   e. If your steel wire is not a silico-manganese steel, does it contain by weight less than 0.20 percent of carbon and more than 0.3 percent of nickel or more than 0.08 percent of molybdenum, and suitable for electric arc welding?
   f. What is the exact diameter of your wire for ingot cutting?